604 A.2d 1119

ST. MARGARET SENECA PLACE

v.

BOARD OF PROPERTY ASSESSMENT, APPEALS AND REVIEW, COUNTY OF ALLEGHENY

v.

MUNICIPALITY OF PENN HILLS, County of Allegheny, and the Penn Hills School District of Allegheny County.

Appeal of MUNICIPALITY OF PENN HILLS, County of Allegheny, and the Penn Hills School District of Allegheny County, Appellants.

Commonwealth Court of Pennsylvania.

Argued Oct. 11, 1991.

Decided Feb. 20, 1992.

Reargument Denied April 22, 1992.

Ira Weiss, for appellants.

David R. Cohen, for appellees.

Before CRAIG, President Judge, PELLEGRINI, Judge, and NARICK, Senior Judge.

NARICK, Senior Judge.

The Allegheny County Board of Property Assessment, Appeals and Review, and three taxing authorities, the Municipality of Penn Hills, County of Allegheny, and Penn Hills School District, (collectively, the Board and taxing authorities) appeal from an order of the Court of Common Pleas of Allegheny County which granted St. Margaret Seneca Place (St. Margaret/nursing home) a real estate tax exemption for tax year 1989, and ordered the refund of the 1989 real estate taxes which the nursing home had already paid.

St. Margaret Seneca Place is a 156–bed nursing home located on approximately ten acres in Penn Hills, Allegheny County, Pennsylvania. The nursing home is a subsidiary of the parent holding company, St. Margaret Health System, Inc. (Health System), as are St. Margaret Hospital, an acute care hospital, and St. Margaret Foundation, the fundraising arm of the Health System. The nursing home's Board of Directors is comprised of six members, a physician in private practice, a senior vice-president of a local bank, and four paid employees of the parent company.

The Health System initially invested a substantial sum of money to develop the nursing home—approximately $1.5 million in the form of a permanent contribution to establish the nursing home's capabilities in providing long-term care. St. Margaret Hospital also helped by providing the nursing home with an interest-free loan in the amount of approximately $850,000 for start-up costs. In order to fund construction, the nursing home sold $6 million worth of tax-

exempt general revenue bonds. According to the nursing home's operating budget, the nursing home had operating costs of $2,934,700 in its first year, $3,333,300 in its second year, and projected costs of $3,699,900 in its third year.[1]

The nursing home, which has a staff of approximately 120 employees, provides three levels of care to its residents: skilled care, intermediate care and personal care. Skilled care generally requires significant medical intervention, and the expectation is that a resident's period of treatment is shorter. The resident is either discharged to a different level of care or to his home. Intermediate care, commonly thought of as long-term care, is available for patients who are disoriented and typically are unable to live on their own. Personal care, or assisted living, is a combination of the two. Residents may require some intervention, but generally are ambulatory with a degree of awareness so that

---

**1.** The nursing home's operating budget also indicated that it showed losses for its first two years of operation, but expected to make a profit during the third year:

| | 07/01/89 to 06/30/90 | 07/01/90 to 06/30/91 | PROFORMA |
|---|---|---|---|
| Revenues | $ 3,446,200 | $ 3,951,300 | $ 4,542,100 |
| Expenses — | 2,934,700 | 3,333,300 | 3,699,900 |
| | 511,500 | 618,000 | 842,200 |
| less | | | |
| Amortization | 77,000 | 77,000 | 77,000 |
| Interest | 566,100 | 566,100 | 566,100 |
| | $ (131,600) | $ (25,100) | $ 199,100 |

The nursing home further indicated in its operating budget that it deducted depreciation in the first year in the amount of $351,000, $364,500 in the second and third years, and included those figures in its losses. However, a depreciation allowance is more properly used in accounting for income tax purposes than to determine loss for exemption purposes. Book value for improvements of real estate is an allowance made against the loss in value of an asset for a defined purpose and computed using a specified method. It should be noted that depreciation should be excluded from the balance sheet because it does not reflect a "real" loss, and is excluded from the balance sheet when appraising the property for assessment purposes. *See American Institute of Real Estate Appraisers, The Appraisal of Real Estate,* p. 371 (8th ed. 1983); *American Institute of Real Estate Appraisers, The Dictionary of Real Estate Appraisal,* p. 90 (1984).

they can live in a supervised environment effectively. Of the 156 beds in the nursing home, in the first year of operation, approximately 30 of those beds were occupied by residents requiring skilled care, 85 requiring intermediate care, and 15 requiring personal care.

A majority of the residents in the nursing home come there as a result of first being admitted as patients to St. Margaret Hospital. Once a patient's medical condition no longer warrants acute care, he or she is admitted to the nursing home, if space is available, where a different level of health care and insurance coverage come into play. All of the nursing home's residents pay for their fees through some form of insurance or private pay. One sampling of the nursing home's breakdown of patients indicated that 48.5% of the patients were covered by Medicaid, 10.7% by Medicare, 10.2% by Blue Cross, and 30.6% paid privately.

On February 23, 1989, the St. Margaret Nursing Home Corporation, also a subsidiary of the Health System, filed an application with the Board requesting real estate tax exemption for the nursing home for tax year 1989, alleging that the property was being used exclusively for charitable purposes. The Board denied the application on the basis that the property did not qualify for the purely public charitable exemption. St. Margaret Nursing Home Corporation filed an appeal from the Board's decision in the Court of Common Pleas of Allegheny County, which reversed the Board's decision and granted the nursing home an exemption from real estate taxation for tax year 1989. The Board and the taxing authorities then filed the present appeal.

The sole question before us is whether St. Margaret Seneca Place meets all of the criteria of a purely public charity necessary to qualify for a real estate tax exemption for tax year 1989.

Whether an institution may claim exemption from taxation on the basis of being an institution of purely public charity is based upon the enabling language found in the Pennsylvania Constitution and the subsequent adoption of a statutory exemption for charitable institutions. Article

VIII, Section 2(a)(v) of the Pennsylvania Constitution provides:

(a) The General Assembly *may* by law exempt from taxation:

(v) Institutions of purely public charity, but in the case of any real property tax exemptions, only that portion of real property of such institution which is actually and regularly used for the purposes of the institution. (Emphasis added.)

Pursuant to that authority, the Pennsylvania General Assembly enacted Section 204(a)(3) of the General County Assessment Law (Law), Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. § 5020–204(a)(3), which conferred a real estate tax exemption on:

All hospitals, universities, colleges, seminaries, academies, associations and *institutions of* learning, benevolence, or *charity, ... founded, endowed, and maintained by public or private charity:* Provided, that the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose.... (Emphasis added.)

Thus, an entity claiming a real estate tax exemption under Section 204(a)(3) of the Law must affirmatively show that the entire institution (1) is one of purely public charity; (2) was founded by public or private charity; and (3) is maintained by public or private charity. *Appeal of the Woods Schools,* 406 Pa. 579, 178 A.2d 600 (1962). The statutory provision exempting property as a charitable institution from taxation is subject to strict construction. *Four Freedoms House of Philadelphia, Inc. v. The City of Philadelphia,* 443 Pa. 215, 279 A.2d 155 (1971).

In *Hospital Utilization Project v. Commonwealth of Pennsylvania,* 507 Pa. 1, 22, 487 A.2d 1306, 1317 (1985), our Supreme Court determined that an institution would qualify as a purely public charity under the Pennsylvania Constitu-

tion and the General County Assessment Law if it possessed the following characteristics:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free from private profit motive.

*See also Hamot Medical Center of the City of Erie v. The School District of The City of Erie,* 144 Pa.Commonwealth Ct. 668, 602 A.2d 407 (Nos. 1319 & 1320 C.D. 1990, filed January 9, 1992.)

 Any entity claiming to be a purely public charity has the burden of proving that its operation satisfies all five of the criteria set forth in *Hospital Utilization Project* for tax exemption purposes. *In re Appeal of the Bethlen Home of the Hungarian Reformed Federation of America Appeal,* 125 Pa.Commonwealth Ct. 315, 557 A.2d 828 (1989). Whether an institution is entitled to a real estate tax exemption is a mixed question of law and fact, and each case must be decided on its own unique factual composition. *In re Appeal of Marple Newtown School District v. The Devereux Foundation,* 39 Pa.Commonwealth Ct. 326, 395 A.2d 1023 (1978).

The Board and taxing authorities contend that the nursing home did not meet its burden of proving that it was entitled to a tax exemption for tax year 1989 pursuant to Section 204(a)(3) of the Law, because it failed to prove that it is a purely public charity, it was founded by public or private charity, and is maintained by public or private charity.

## I. Purely Public Charity

### a) Advances a Charitable Purpose

Addressing the first requirement of Section 204(a)(3) of the Law, the Board and taxing authorities contend that the

nursing home did not satisfy the five-part test set forth in *Hospital Utilization Project.* Beginning with the first criteria, the Board and taxing authorities argue that the nursing home does not advance a charitable purpose because every resident in the nursing home is, to some extent, a fee paying client. This court has previously held that an institution is not tax exempt merely because it provides services to the elderly. *The Lutheran Home at Topton v. The Board of Assessment Appeals of Lehigh County,* 100 Pa.Commonwealth Ct. 244, 515 A.2d 59 (1986), *petition for allowance of appeal denied,* 515 Pa. 589, 527 A.2d 548 (1987) and 515 Pa. 611, 529 A.2d 1084 (1987).

■ We agree that the elderly are a legitimate subject of charity, and caring for the elderly may be considered charitable when speaking in generalities. However, when residents of a nursing home are required to pay the facility for their right to live there, the nursing home is not advancing a charitable purpose, but merely conducting business. In this case, *all* the residents of the nursing home are either self-paying or third-party paying customers whose patient population is expected to make the nursing home a profit. Although the nursing home contends that it admits patients without regard to their ability to pay, when the executive vice-president of the hospital was asked whether a non-paying resident would be admitted over a paying resident, he responded, "We would be really forced I would think to take—we don't have a hard and fast rule to answer that question, but we would be prudent to take the person who could afford to pay us for the care." (Notes of Testimony at 185a.)

Moreover, the nursing home's operating budget indicates that it intends to make a profit of $199,100 in its third year of operation as a result of revenues collected from its residents, and nowhere does its financial statements indicate that it receives donations from any outside sources. As this court noted in *Y.M.C.A. of Germantown v. Phila-*

*delphia,* 323 Pa. 401, 409, 187 A. 204, 208 (1936),[2] an entity claiming a tax exemption as a charitable institution must possess an eleemosynary characteristic not possessed by institutions devoted to profit. "What is given must be more nearly gratuitous than for a price which impresses one as being proportionate to the services rendered." We further stated in that opinion:

> If a person built a lodging house to provide lodging for any personally unobjectionable individuals who might apply, whether they were self-supporting or impoverished, at a cost to those individuals which would yield *no* profit to the proprietor, such a lodging house would not be a charitable institution. (Emphasis added.)

*Germantown,* 323 Pa. at 412, 187 A. at 209.

Therefore, because the nursing home intends to make a profit and charges every patient a fee for its services, it lacks the requisite eleemosynary characteristic. As such, the nursing home has failed to prove that it is advancing a charitable purpose.

### b) Donates or Renders Gratuitously a Substantial Portion of its Services

The test for determining whether an institution claiming a charitable tax exemption donates or renders gratuitously a substantial portion of its services has been set forth by our Supreme Court in *Hospital Utilization Project,* 507 Pa. 1, n. 9, 487 A.2d at 1315, n. 9:

> "Whether or not the portion donated or rendered gratuitous is substantial is a determination to be made on the totality of circumstances surrounding the organization. The word 'substantial' does not imply a magical percent-

2. *Germantown* is still considered good law and has only been overruled by *West Allegheny Hospital v. Board of Property Assessment, Appeals and Review of Allegheny County,* 500 Pa. 236, 455 A.2d 1170 (1982), to the extent that its use of the word "charity" was improper in concluding that there only be a nominal charge to beneficiaries of charitable institutions. *West Allegheny* determined that such use of the word conflicted with the evident intent of the proviso to accommodate evolving institutional needs in light of limits to public and private generosity.

age. It must appear from the facts that the organization makes a bona fide effort to service primarily those who cannot afford the usual fee."

In this case, the nursing home does not make a bona fide effort to service those who cannot afford their usual fee, but rather accepts residents who generally can afford the fees it has set. As stated previously, all of the residents in the nursing home pay for services rendered. The fact that 48.5% of the residents pay for the nursing home's service through Medicaid, which the nursing home claims does not cover the full cost of those residents' fees,[3] is not indicative that the nursing home gratuitously renders a substantial portion of its services.[4]

The nursing home is confusing business with charity. It is the nursing home that has determined that it will accept whatever amount Medicaid pays out for services rendered to those residents paying through Medicaid. The nursing

3. Pursuant to the record, as of February 28, 1990, the following figures indicate the amount the nursing home is reimbursed by Medicaid and the amount the nursing home loses per patient according to the level of care the patient receives:

| | Skilled Care | Intermediate Care |
|---|---|---|
| Total Cost/Day | $110.79 | $97.56 |
| Medicaid Reimbursement/Day | 70.33 | 59.15 |
| Loss per Medicaid Patient/Day | 40.46 | 38.41 |

4. See *G.D.L. Plaza Corporation v. Council Rock School District,* 515 Pa. 54, 526 A.2d 1173 (1987), where our Supreme Court held that a taxpayer's housing project for elderly residents was not entitled to a charitable tax exemption because the entire funding for the project, apart from rents paid by residents, was derived from the federal government. *Also see In Re Appeal of Doctor's Hospital,* 51 Pa.Commonwealth Ct. 31, 414 A.2d 134 (1980), where this court held that Doctor's Hospital was not entitled to a charitable tax exemption because, *inter alia,* while no doctors serving at the hospital received compensation directly from the hospital and diagnostic services were rendered free of charge, if any treatment was necessary, patients were charged regardless of their ability to pay and doctors were compensated either directly by the patients or by third-party insurers.

home also *expects payment* from Medicaid for those services. If payment is not received, the nursing home has incurred a bad debt as any other business would and has not provided charity. The nursing home's situation is analogous to the airline industry which charges passengers various rates for the same flight. No one would contend that an airline is a charity because individual passengers receive different rates while the airline loses money. The airline's goal is to fill the plane to capacity whichever way it can, and many times that means allowing some passengers to fly at lower rates than others. Similarly, the nursing home intends to fill all 156 beds by admitting residents who are able to pay for its services at varying rates. While this is not an unusual business practice, it certainly is not charity.

▮ Additionally, as a further indication that the nursing home does not accept residents who cannot afford its fee, the executive vice-president of the hospital stated the following in response to being asked whether the nursing home would accept a non-paying resident over a paying resident:

> Given our current census and the number of Medicaid patients that we have now and the amount of charitable care that we are already providing, we would have to take the person who could afford to pay us something. We don't have unlimited resources in terms of funds to continue to take care of our deficits. (Notes of Testimony at 187a–188a.)

Consequently, because the nursing home does not make an effort to serve those who cannot afford its usual fee, we cannot find that the nursing home gratuitously donates a substantial portion of its services.

### c) Benefits a Substantial and Indefinite Class of Persons who are Legitimate Subjects of Charity

The Board and the taxing authorities also contend that the nursing home does not benefit a substantial and indefi-

nite class of persons who are legitimate subjects of charity because while nearly half of the nursing home residents pay for their care through Medicaid, they are not an indefinite class of persons. We agree. Even though the nursing home argues that it has an open admission policy and admits any individual regardless of his ability to pay for its services, this claim is false in light of the executive vice-president's statement that the nursing home would accept a paying client over a non-paying client.

█ This court recently stated that the mere existence of an open admission policy is not enough to meet the charitable exemption. The institution must prove that it actually provides its valuable services to someone who cannot afford to pay. *In Re Appeal of Pittsburgh NMR Institute,* 133 Pa.Commonwealth Ct. 464, 577 A.2d 220 (1990). Because the nursing home does not actually have an open admission policy, it has failed to meet the third criteria of the *Hospital Utilization Project* test.

### d) Relieves the Government of Some of its Burden

█ The Board and taxing authorities also vehemently argue that the nursing home does not relieve the government of some of its burden, because it provides services to a large percentage of its residents which pay for its services via government-sponsored programs. We have previously addressed this issue in *Germantown,* 323 Pa. at 413–414, 187 A. at 210:

> Any institution which by its charitable activities relieves the government of part of this burden is conferring a pecuniary benefit upon the body politic, and in receiving exemption from taxation, it is merely being given a quid pro quo for its services in providing something which otherwise the government would have to provide.

Although the nursing home contends that it does relieve some of the government's burden because there are insufficient nursing homes to meet the needs of Medical Assistance recipients requiring nursing home care, considering that governmentally assisted and supported programs such

as Medicare and Medicaid account for 59.2% of the nursing home's revenues, we have difficulty seeing how the nursing home is relieving the government of services which it would otherwise have to provide to elderly patients who have no other health insurance coverage. Therefore, the nursing home has failed to prove that it relieves the government of some of its burden.

### e) Operates Entirely Free From Private Profit Motive

Finally, the Board and taxing authorities argue that the nursing home does not operate entirely free from a private profit motive because the nursing home has admitted that its purpose is to maintain a financially competitive position with other nursing homes. The nursing home, on the other hand, argues that it operates free from a private profit motive because it is not designed to operate at a profit, and that is evidenced by the fact that it has an open admissions policy and purportedly accepts Medicaid recipients whom the for-profit nursing homes would not accept.

As we have already noted, in reality, the nursing home does not have an open admission policy because it takes into consideration whether a potential resident can pay for its services and to what extent. Also, the nursing home's statement of purpose and directions provides, "The health system shall utilize the organizational structure that strives to achieve optimal volumes of patient services and maintain a financially competitive and viable position." The executive vice-president of the nursing home testified that statement meant that the nursing home wanted to be financially competitive with other profit-motivated health care providers in western Pennsylvania. (Notes of Testimony at 115a.)

More important though is the fact that the nursing home has outlined in its operating budget that it expects to make a profit in tax year 1991. While the nursing home may have operated at a loss during tax years 1989 and 1990, the fact that it intends to make a profit during 1991 eliminates any possibility that it operates entirely free from a private profit motive. Consequently, the nursing home

has failed to meet the fifth criteria of the *Hospital Utilization Project* test, and ultimately, has failed to prove that it qualifies as a purely public charity as required by Section 204(a)(3) of the Law.

## II. Founded by Public or Private Charity

The nursing home contends that it was founded by charity because Health System, which is a tax-exempt charitable organization, contributed $1.5 million to initially establish and capitalize the nursing home. Additionally, St. Margaret Hospital has advanced approximately $850,000 in the form of a non-interest bearing loan for start up costs, and has guaranteed payment of the $6 million worth of tax-exempt bonds issued to the nursing home.

█ Although Health System did contribute $1.5 million to establish and capitalize the nursing home, the advancement by St. Margaret Hospital of approximately $850,000 in the form of a loan, non-interest bearing or otherwise, is still a loan which the nursing home is expected to repay. Additionally, even though the hospital has guaranteed the payment of the $6 million tax-exempt bonds, the nursing home is expected to pay back the principal on those bonds. Because the repayment of both the loan and the principal on the bonds cannot be considered charity, we find that the nursing home was not founded by either public or private charity.

## III. Maintained by Public or Private Charity

█ Finally, based on our review of the record, we find that the nursing home is also not maintained by public or private charity. The current source of the nursing home's funds is receipt of payment for its services from all of its residents, whether that payment be through Medicaid, Medicare, private insurers, or private pay. There is no evidence of any other source of funding. As such, the nursing home is not maintained by either public or private charity.

Consequently, the nursing home has failed to meet the requirements necessary for an entity claiming a real estate

tax exemption under Section 204(a)(3) of the Law. Accordingly, the decision of the trial court is reversed.

## ORDER

AND NOW, this 20th day of February, 1992, the order of the Court of Common Pleas of Allegheny County, No. GD89–17941, dated March 12, 1991, is reversed.