640 A.2d 380

In re ST. MARGARET SENECA PLACE, Appellant,

v.

BOARD OF PROPERTY ASSESSMENT, APPEALS AND RE-
VIEW, COUNTY OF ALLEGHENY and Municipality of Penn
Hills, County of Allegheny, and The Penn Hills School District
of Allegheny County, Appellees.

Supreme Court of Pennsylvania.

Argued March 8, 1994.

Decided April 20, 1994.

Ira Weiss, Deputy County Sol., for County of Allegheny.

Lee V. Price, Maiello, Andrews & Price, Pittsburgh, for Penn Hills School Dist.

Stephen A. Zappala, Jr., Pittsburgh, for Bd. of Property Assessment, Appeals and Review.

August C. Damian, Damian & Deluca, Pittsburgh, for Municipality of Penn Hills.

Philip J. Tannenbaum, and Michael J. Campbell, Philadelphia, for amicus curiae, Pennsylvania Health Law Project, Inc.

Edward V. Weisgerber, David R. Cohen, Robert L. Byer, Kirkpatrick & Lockhart, Pittsburgh, for appellant.

Allen C. Warshaw, Roland Morris, Duane, Morris & Heckscher, Philadelphia, for amicus curiae, The Hospital Ass'n of PA.

Seymour J. Schafer, Kenneth A. Eisner, Markel, Schafer & Means, P.C., Pittsburgh, for amicus curiae, The Hospital Council of Western PA.

Joseph C. Bright, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, for amicus curiae, Pennsylvania Ass'n of Non–Profit Nursing Homes for the Aging.

Richard E. Connell, Ball, Skelly, Murren & Connell, Harrisburg, for amicus curiae, Pennsylvania Catholic Conference and Pennsylvania Catholic Health Ass'n.

Howard M. Soloman, Stewart M. Weintraub, Abrahams, Loewenstein, Bushman & Kauffman, P.C., Philadelphia, for amicus curiae, American Jewish Congress, Pennsylvania Council of Churches, Jewish Fed.

Before NIX, C.J., and FLAHERTY, PAPADAKOS, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This appeal from the order of the Commonwealth Court, 145 Pa.Cmwlth. 615, 604 A.2d 1119, involves a determination of whether a nursing home meets the criteria to be exempted from payment of property taxes. The trial court determined that St. Margaret Seneca Place, a nursing home in Penn Hills, meets all the criteria for classification as a purely public charity set forth in *Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985). The Commonwealth Court reversed, holding that the Seneca Place nursing home does not meet any of those criteria, representing a serious departure from our decisions in this area and having broad implications with respect to the status of other health care providers and nursing homes; thus we granted allocatur.

Seneca Place is a subsidiary of the St. Margaret Health System, Inc., a tax-exempt charitable organization. The system's other subsidiaries are St. Margaret Memorial Hospital, an acute care hospital, and St. Margaret Foundation, the fundraising arm of the health system, also tax-exempt charitable organizations. The Seneca Place home was established in the 1980's with an initial donation of $1.5 million from St. Margaret Health System. It secured additional funding through a tax-exempt bond issue of $6 million, guaranteed by St. Margaret Hospital. In addition to the initial donation from St. Margaret Health System, St. Margaret Hospital has given the nursing home interest-free loans of approximately $850,-000 to help cover start-up costs and operating expenses. Seneca Place operates a 156–bed facility offering a variety of skilled care, long-term care, and personal care services for elderly residents.

The home opened in 1989. It applied for an exemption from real estate taxes that year. The Allegheny County Board of Property Assessment, Appeals and Review denied the application. On appeal, the Court of Common Pleas of Allegheny County reversed, granting the exemption, but was reversed again by the Commonwealth Court. The tribunals all agreed that *Hospital Utilization Project v. Commonwealth (HUP )*, *supra*, establishes the criteria for tax exemption as a purely public charity, but differed in their application of the standard.

Under *HUP*, an entity may be classified as a purely public charity if it: 1) advances a charitable purpose; 2) donates or renders gratuitously a substantial portion of its services; 3) benefits a substantial and indefinite class of persons who are legitimate subjects of charity; 4) relieves the government of some of its burden; and 5) operates entirely free from private profit motive.

The trial court found that the nursing home advances a charitable purpose in providing shelter and care for many residents who cannot pay the cost of their care. It found that in May, 1990, over forty-eight percent of the nursing home residents were Medicaid recipients. For those

patients, government payments cover about two-thirds of the patients' costs, and the nursing home makes up the difference. The care of elderly residents who cannot pay their full costs serves a charitable purpose. *In re Tax Appeals of the United Presbyterian Homes,* 428 Pa. 145, 236 A.2d 776 (1968). The trial court further found that the home operates at a loss and will continue to do so as a result of its commitment to serve all applicants without regard to their financial means, their insurance, or the adequacy of government payments on their behalf.

The Commonwealth Court held that the nursing home does not advance a charitable purpose for two reasons: 1) all of the residents are either self-paying or are paid for by Medicare or Medicaid; and 2) the home, which has at all times run at a loss, intends to make a profit. Neither reason is correct. As to the first reason, the absence of indigent residents who receive no government support is not surprising, and is certainly not, standing alone, enough to disqualify a nursing home from an exemption as a purely public charity. In modern America it is hard to find any person in need of nursing home care who is uninsured, unable to pay, and wholly ineligible for government support in the form of Medicare or Medicaid coverage. Our prior decisions do not equate the acceptance of Medicaid payments as the equivalent of conducting a business for profit. The decision to accept Medicaid payments to help defray the cost of care for residents is perfectly consistent with a finding that the nursing home advances a charitable purpose.

With respect to the second reason, that Seneca Place intends to make a profit, the Commonwealth Court impermissibly substituted its own finding of fact for that of the trial court, when the latter was supported by substantial evidence. The Commonwealth Court found that Seneca Place "expects to make a profit in tax year 1991." 145 Pa.Cmwlth. 615, 628, 604 A.2d 1119, 1126. In fact, the "budget" on which the court relied was not a budget but a *pro forma* study of the consequence of designated operating changes which the home considered but did not adopt. Moreover, the study did not

include debt service which would have eaten up the hypothetical "profit." The Commonwealth Court should have accepted the trial court's finding that the program is not designed to operate at a profit, which was based upon substantial evidence of record, rather than substituting its finding that the home expects to make a profit. *Commonwealth, Dept. of Transportation v. O'Connell,* 521 Pa. 242, 555 A.2d 873 (1989) (as long as sufficient evidence exists in the record to support the finding made by the trial court as factfinder, we are precluded from overturning that finding); *cf. Estate of McGovern v. State Employees' Retirement Board,* 512 Pa. 377, 517 A.2d 523 (1986) (under agency law, a reviewing court shall affirm the adjudication unless ... any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence).

*HUP*'s second criterion is that the subject entity must donate or render gratuitously a substantial portion of its services. The trial court held that Seneca Place satisfies this criterion by providing for the forty-eight percent of its residents who are only partially paid for by Medicaid. It also found that many of the residents whose costs are paid by Medicare or private insurance will eventually exhaust their means and their other insurance. They will then add to the number of residents on Medicaid who are recipients of significant gratuitous services at Seneca Place.

The Commonwealth Court held, conversely, that Seneca Place makes no:

bona fide effort to service those who cannot afford their usual fee, but rather accepts residents who generally can afford the fees it has set.... The fact that 48.5% of the residents pay for the nursing home's service through Medicaid, which the nursing home claims does not cover the full cost of those residents' fees, is not indicative that the nursing home gratuitously renders a substantial portion of its services.

The nursing home is confusing business with charity. It is the nursing home that has determined that it will accept

whatever amount Medicaid pays out for services rendered to those residents paying through Medicaid. The nursing home also *expects payment* from Medicaid for those services. If payment is not received, the nursing home has incurred a bad debt as any other business would and has not provided charity. The nursing home's situation is analogous to the airline industry which charges passengers various rates for the same flight. No one would contend that an airline is a charity because individual passengers receive different rates while the airline loses money. The airline's goal is to fill the plane to capacity whichever way it can, and many times that means allowing some passengers to fly at lower rates than others.

*Id.* 145 Pa.Cmwth. at 625–26, 604 A.2d. at 1124–25 (emphasis in original, footnotes omitted). This reasoning is specious. If a potential airline passenger cannot afford a full-fare ticket and the airline does not offer a reduced fare, the passenger will merely forgo the flight, whereas if the nursing home does not accept an aged Medicaid patient whose allotment does not fully cover his costs, the public will fund the patient's care at a public institution because such care is not viewed as a privilege like an airplane flight but is deemed to be a public responsibility. The aged in need of medical care are legitimate objects of charity, whereas airline passengers are not. The partial subsidy of the costs of caring for an elderly patient is unquestionably a charitable act.

The court further relied on a scintilla of testimony from the executive director of Seneca Place. Asked the unrealistic hypothetical question involving two patients who apply simultaneously for a single bed, one patient able to pay for his own care and the other unable to pay and ineligible for even partial third-party reimbursement (*e.g.* Medicaid), which patient would Seneca Place accept, the officer responded:

*Given our current census and the number of Medicaid patients that we have now and the amount of charitable care that we are already providing,* we would have to take the person who could afford to pay us something. We don't

have unlimited resources in terms of funds to continue to take care of our deficits.

(Emphasis added.) The Commonwealth Court erroneously concluded from this that "the nursing home does not make an effort to serve those who cannot afford its usual fee." *Id.* at 626, 604 A.2d at 1125.

The requirement that an institution donate or render gratuitously a substantial portion of its services does not imply a requirement that the institution forgo available government payments which cover *part* of its costs, or that it provide wholly gratuitous services to some of its residents. The showing that the nursing home bears one-third of the cost of care for half its residents satisfies the home's burden of proof for this requirement.

The trial court held that the third *HUP* requirement was met, as Seneca Place benefits a substantial and indefinite class of persons who are legitimate subjects of charity. The court found that the nursing home has an open admissions policy which benefits the designated class of people, and never discriminated against a Medicaid recipient. If there is a vacant bed and the next applicant is a Medicaid recipient, that applicant will be accepted, despite the understanding and expectation that this causes financial loss to the institution.

The Commonwealth Court held that the third criterion was not met. It made a factual finding that the nursing home's testimony that it admitted residents regardless of their ability to pay "was false in light of the executive vice president's [sic] statement that the nursing home would accept a paying client over a non-paying client." *Id.* In addition to this improper fact-finding, the court held that even if the home had an open admission policy, this would not meet the criterion unless the institution proves that it actually provides its services to someone who cannot afford to pay, citing *In re Pittsburgh NMR Institute,* 133 Pa.Cmwlth. 464, 577 A.2d 220 (1990). It implied that the nursing home had not met this burden of proof, apparently rejecting the designation of Medicaid recipients whose costs are not fully covered as people "who cannot afford to pay."

The Commonwealth Court was in error. It distorted the testimony of the executive director of the nursing home. He qualified his testimony by reference to the current level of Medicaid patients and the current resident census. Other evidence of record supports the trial court's finding that the home never discriminated against Medicaid patients. Moreover, people whose costs are only partially covered by Medicaid payments are manifestly legitimate objects of charity and people who "cannot afford to pay."

 The trial court found that Seneca Place relieves the government of some of its burden, satisfying the fourth requirement of *HUP*. The evidence showed that nursing homes operated for profit either refuse to accept Medicaid-covered residents or they restrict the number of such admissions. There is thus a shortage of nursing home beds for Medicaid-covered patients; this was one of the reasons Seneca Place was founded. The trial court found that but for Seneca Place, many of their Medicaid recipients would have to be cared for in county-provided facilities. The cost of caring for those residents would *not* fully be covered by Medicaid. The court therefore concluded that the nursing home operations did relieve the government of some of its burden.

The Commonwealth Court clearly erred in holding that this criterion was not met because Medicare and Medicaid payments make up 59.2% of the nursing home's revenues, interpreting that to mean that the home failed to show that it is caring for patients who otherwise would receive government support. The *HUP* test of whether an institution has relieved the government of some of its burden does not require a finding that the institution has fully funded the care of some people who would otherwise be fully funded by the government. The test is whether the institution bears a substantial burden that would otherwise fall to the government. The home pays a substantial portion of the cost for Medicaid patients, who comprise about half of its residents; this fulfills the requirement that the home relieve the government of some of its burden.

■ The trial court found that Seneca Place met the fifth *HUP* criterion, that it operate entirely free from a private profit motive. The court emphasized the home's dedication to provide services to Medicaid patients and others who cannot pay the cost of their care. The Commonwealth Court held that this criterion was not met because the home "expects to make a profit in tax year 1991. . . . [T]he fact that it intends to make a profit during 1991 eliminates any possibility that it operates *entirely* free from a profit motive." 145 Pa.Cmwlth. at 628, 604 A.2d. at 1126 (emphasis added).

The nursing home argues that the Commonwealth Court erred in failing to distinguish a surplus from a "private profit." It relies on *West Allegheny Hospital v. Board of Property Assessment, Appeals and Review,* 500 Pa. 236, 455 A.2d 1170 (1982), which distinguished a permissible surplus of revenue from an impermissible private profit. In *West Allegheny,* we implied that payment of excessive salaries and fringe benefits to corporate officers might evidence a private profit motive, but held that a surplus reapplied to the maintenance and operation of the facility was not a private profit. Indeed, the statute forming the basis for appellant's claim of exemption, section 204(a)(3) of the General County Assessment Law, Act of May 22, 1933, P.L. 853, as amended, 72 P.S. § 5020–204(a)(3), contains the following proviso: "Provided, That the entire revenue derived by the [institution] be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose," making it explicit that tax-exempt charitable institutions will have "revenue" including surplus revenue which may be utilized not only to cover operating expenses but to increase efficiency, facilities, grounds, and buildings. Thus surplus revenue is not synonymous with private profit, provided it is used as required by the statute. The Commonwealth Court never addressed the indicia of private profit as a motive. It rested its conclusion simply on its erroneous finding that a surplus was projected for one year. In fact, the home had significant debts, includ-

ing $850,000 in interest-free loans from St. Margaret Hospital, which should have figured in the court's review and affected its holding relative to the motive to earn a private profit. Even if the home had actually projected a surplus in its operations in 1991, any such surplus would have been more than offset by the home's substantial indebtedness, and, if used in accordance with the statute creating the exemption, would not affect the eleemosynary nature of the institution.

Other factors than those established in *HUP* support the conclusion that Seneca Place is a purely public charity entitled to exemption from property taxes. The Commonwealth Court held that the nursing home was not founded or maintained by charity, despite recognizing that St. Margaret Health System contributed $1.5 million outright to start the home. The court fails to explain why this does not constitute being founded by charity, but rests its reasoning on the fact that the related $850,000 loans and a $6 million bond issue must be repaid. It was error to disregard the $1.5 million contribution of St. Margaret Health System to establish the nursing home. Given the health system's goal of providing a place for the care of all persons in need of nursing home care, regardless of means, there was a clear eleemosynary motive and a charitable gift in founding the home. Moreover, it is not indispensable that the institution be maintained by charity. As we noted in *West Allegheny Hospital, supra,* "[o]ne would have to be removed from modern-day realities to believe that such costs are easily subsidized [by charitable donations], even in part." 500 Pa. at 241 n. *4* 455 A.2d at 1172 n. 4. We hold, therefore, that the Commonwealth Court erred in reversing the trial court's conclusion that Seneca Place fulfilled all the criteria set forth in *HUP* to establish its status as a purely public charity.

The order of the Commonwealth Court is reversed, and the relief ordered by the trial court is reinstated.

ZAPPALA, J., did not participate in the consideration or decision of this case.

CAPPY, J., files a dissenting opinion.

MONTEMURO, J., is sitting by designation as senior justice pursuant to Judicial Assignment Docket No. 94 R1800 due to the unavailability of LARSEN, J.; see No. 127 Judicial Administration Docket No. 1, filed October 28, 1993.

CAPPY, Justice, dissenting.

I dissent on the basis of the learned Commonwealth Court opinion.