ARC HUMAN SERVICES, INC., Appellant,

v.

CLEARFIELD COUNTY ASSESS-MENT OFFICE AND TAX BUREAU, and Jennifer A.M. Wooster, and Kim C. Kesner.

Commonwealth Court of Pennsylvania.

Argued June 15, 2015.

Decided July 13, 2015.

Alexandra A. Romano, Pittsburgh, for appellant.

Kim C. Kesner, Clearfield, for appellee Clearfield County Assessment Office and Tax Bureau.

BEFORE: ROBERT SIMPSON, Judge, and P. KEVIN BROBSON, Judge, and JAMES GARDNER COLINS, Senior Judge.

OPINION BY Judge P. KEVIN BROBSON.

In these consolidated appeals, Appellant ARC Human Services, Inc. (ARC) appeals from the orders of the Court of Common Pleas of Clearfield County (trial court).

The trial court denied ARC's statutory tax appeal from the decisions of the Clearfield County (County) Board of Assessment (Board), which denied ARC's request for tax exemptions for three tax parcels. We affirm the trial court's orders.

ARC operates group homes in ten Pennsylvania counties, providing residential accommodations for individuals with intellectual disabilities. ARC is the owner of three parcels of property in the County identified in the County's tax assessment maps. ARC operates a group home on one of the subject parcels, having a street address of 3147 Oklahoma–Salem Road in Sandy Township (No. 128–C4–42–243 on the County's tax assessment map). This parcel consists of a residential dwelling, buildings, and two lots. ARC also operates a group home facility located on two separately assessed parcels (No. 119.0–G02–457–5 and No. 119–0–G02–457–6 on the assessment map), which share the street address of 10015 State Park Road in Huston Township. Those parcels together consist of a house, a garage, a building, and .27 acres.

Between February 17, 2012 and October 30, 2012, ARC sent letters to the Board regarding the Sandy Township and Huston Township parcels, seeking exemption from real estate taxes based upon ARC's assertion that it is an institution of purely public charity (IPPC) and that the parcels are used for such purposes. On May 7, 2013, the Board held a hearing on the applications. On or about May 9, 2013, the Board issued notices of Board Assessment Appeals, in which the Board, without reference to ARC's claim for exemption, affirmed the parcels' original market valuations and tax assessments. On May 28, 2013, ARC filed appeals from the Board's notices with the trial court, asserting that, contrary to the Board's implicit conclusions, the evidence ARC submitted to the Board supported its contention that the properties should be exempt from taxation.

On April 4, 2014, the trial court conducted a non-jury trial on the appeals and, on June 23, 2014, issued an opinion and orders affirming the Board's decisions. The trial court observed that an entity seeking tax exemption for its real property must satisfy two legal criteria, the first one being a constitutional question, *i.e.*, a demonstration that the entity is an IPPC and the second one being a statutory question under the Institutions of Purely Public Charity Act (Act 55),[1] *i.e.*, whether the property for which an IPPC seeks a real estate tax exemption is being used to advance a charitable purpose of the IPPC that owns it. *Alliance Home of Carlisle, Pa. v. Bd. of Assessment Appeals*, 591 Pa. 436, 919 A.2d 206, 224 (2007). The trial court noted that the Supreme Court's decision in *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985) (*HUP*), set forth the proper analysis to resolve the first question—the constitutional question of whether an entity is an IPPC.[2] The trial court concluded that ARC failed to satisfy the second *HUP* element, based upon sev-

---

1. Act of November 26, 1997, P.L. 508, *as amended,* 10 P.S. §§ 371–385.

2. *HUP* requires an entity seeking tax exemption to establish that it has the following characteristics: (1) advances a charitable purpose; (2) donates or renders gratuitously a substantial portion of its services; (3) benefits a substantial and indefinite class of persons who are legitimate subjects of charity; (4) relieves the government of some of its burden; and (5) operates entirely free from profit motive. *Id.* at 1317. An entity seeking a *HUP*-based tax exemption as an IPPC must submit evidence concerning the activities of the institution as a whole. *Alliance for Bldg. Cmties. v. Cnty. of Lehigh Bd. of Assessment Appeals,* 73 A.3d 659, 664 (Pa.Cmwlth.2013).

eral key findings: (1) that the evidence does not show that some or any residents do not have to make any personal financial payment in order to live in an ARC group home; (2) that the evidence is insufficient to show the financial burden ARC itself bears in order to provide services to its residents; and (3) that ARC's evidence indicates that only a negligible portion of its costs of operating are from charitable contributions. Based upon its findings, the trial court affirmed the Board's rejection of ARC's request for an exemption for the parcels.

On appeal,[3] ARC raises the following two issues for our review: (1) whether the trial court erred in concluding that ARC does not donate or render gratuitously a substantial portion of its services to charity for the purpose of satisfying the second *HUP* element; and (2) whether the trial court applied the wrong standard of proof by stating that ARC had a "heavy burden" to establish the second *HUP* prong.

In *HUP*, our Supreme Court held that the question of whether the services an entity donates or gratuitously provides is "substantial" is an inquiry that is based upon the totality of the circumstances and that there is no specific percentage of donated or gratuitous services that must be established. *HUP*, 487 A.2d at 1316. The Supreme Court opined that "[i]t must appear from the facts that the organization makes a bona fide effort to service primarily those who cannot afford the usual fee." *Id.*

In *WRC North Fork Heights v. Board of Assessment Appeals, Jefferson County,*

917 A.2d 893 (Pa.Cmwlth.), *appeal denied,* 596 Pa. 721, 944 A.2d 760 (2007), we considered an appeal involving an entity that provided low income elderly individuals with housing. The evidence indicated that residents paid rent and a federal housing program paid WRC a subsidy equal to the "difference between [the rent] and fair market value." *WRC,* 917 A.2d at 899. WRC also offered evidence that it aided residents to access services for medical, social, and emotional needs. The Court noted that the evidence concerning such services did not describe the extent of that help or whether WRC provided the help for no charge. *Id.* We rejected WRC's claim that it had established that it made a bona fide effort to service individuals who could not afford the usual costs of living in the housing provided. We concluded:

> WCR's vague testimony that it assists residents in accessing help with medical, social, emotional and spiritual needs, with no attempt to quantify the costs incurred by WRC, could not meet the specific requirements regarding donations stated in [Act 55]. *In terms of the HUP analysis, the record lacks evidence that WRC donates or renders gratuitously a "substantial portion" of its services.*

*Id.* at 901 (emphasis added).

In this Court's recent decision in *Fayette Resources v. Fayette County Board of Assessment Appeals,* 107 A.3d 839 (Pa. Cmwlth.2014), we reviewed the appeal of Fayette Resources, a non-profit entity exempt from federal taxation operating group homes for intellectually disabled individuals, which sought an exemption as an

---

**3.** Our standard of review of a trial court's order affirming a tax assessment board's rejection of a request for a tax exemption is limited to considering whether the trial court's factual findings are supported by substantial evidence and whether the trial court

abused its discretion or committed an error of law. *Lewistown Hosp. v. Mifflin Cnty. Bd. of Assessment Appeals,* 706 A.2d 1269, 1271 n. 3 (Pa.Cmwlth.1998), *appeal denied,* 563 Pa. 679, 759 A.2d 925 (2000).

IPPC. *Fayette Resources,* 107 A.3d at 842. In addition to providing residential living, Fayette Resources also provides training for its residents in "living skills" and for employment. Similar to ARC, Fayette Resources operates group homes in several other Pennsylvania counties.

In considering whether Fayette Resources satisfied the second *HUP* requirement, the Court noted that (1) the Pennsylvania Department of Public Welfare (DPW) has a contract with Fayette Resources to provide residential housing and other services to its residents and (2) DPW pays Fayette Resources for the services for individuals who are eligible, most of which comes from Medicaid funds. *Id.* at 843. If an individual is eligible for such funds, the individual does not have to contribute any further money to Fayette Resources. If, on the other hand, an individual is not eligible for the state funding, he or she must pay Fayette Resources for the services. *Id.* Fayette Resources offered no evidence regarding charitable contributions, volunteer services, or donations of any kind. *Id.* Testimony in that case indicated that Fayette Resources operated with a surplus, which it used to acquire and adapt houses for use as group homes. *Id.*

The Court concluded that the record contained no "evidence ... as to how the government payments and other fees that [Fayette] Resources receives for providing care and services compare to the total cost of such care and services, including the acquisition and rehabilitation of the houses." *Id.* at 844. While acknowledging that an entity seeking exemption is not precluded from obtaining an exemption simply because it receives some payment for all of its services, the Court explained the connection between this observation and its ultimate conclusion:

[The second] requirement is satisfied if payments that the entity receives for a substantial number of those that it serves are less than the cost of the services it provides.... The requirement of donation or gratuitous rendering of services may also be satisfied if the entity demonstrates that it is meeting a need of a group that is a legitimate object of charity at cost or less.... *In contrast, this requirement is not met where the government provides funding that fully subsidizes all of the entity's expenses ... Here, the record is devoid of any evidence that [Fayette] Resources provides any of its services for payments lower than the full cost of those services or even that it provides services at cost....* [Fayette] Resources did [not] make any showing that the Medicaid payments that it receives are less than the full costs of its services, including the acquisition and fixing up of its group homes, or introduce any evidence as to how those payments compare to the total cost of its services.

*Id.* at 847–48 (emphasis added).

ARC, relying primarily upon our Supreme Court's holding in *St. Margaret Seneca Place v. Board of Property Assessment, Appeals and Review,* 536 Pa. 478, 640 A.2d 380 (1994), contends that the trial court erred in its analysis of the evidence. In *St. Margaret,* our Supreme Court concluded that the entity seeking an exemption as an IPPC submitted sufficient evidence demonstrating that it donated or gratuitously rendered a substantial portion of its services. St. Margaret was a skilled-care, long-term care facility providing services to elderly individuals. St. Margaret demonstrated that it provided for forty-eight percent of its residents for whom Medicaid only paid part of the costs of care and that many of the residents whose costs were paid by private insurance or Medicare would eventually exhaust those

sources of payment and that the provider would then have to assume the cost of those patients. *St. Margaret,* 640 A.2d at 383. The Supreme Court opined that the second *HUP* criteria did not require an institution to "forgo available government payments which cover *part* of its costs, or that it provide wholly gratuitous services to some of its residents. The showing that the nursing home bears one-third of the cost of care for half of its residents satisfies the home's burden of proof for this requirement." *St. Margaret,* 640 A.2d at 384.

■ In this matter, ARC relied upon the testimony of Joseph P. Scrip, ARC's Chief Financial Officer. Mr. Scrip testified that ARC spent $15,445,076, $17,961,996, and $18,286,555 respectively for the fiscal years ending June 30, 2011, 2012, and 2013, to provide services in accordance with its mission. (*Id.*) Mr. Scrip testified regarding annual amounts ARC received as charitable contributions and that ARC used those contributions institutionally to offset deficits and to offer services that the government cannot provide. (R.R. at 97a.) Mr. Scrip testified that in the years 2011–2013, ARC received $83,446, $319,061, and $145,888, respectively, in charitable contributions. (R.R. at 106a.) Those funds were used "to provide services that are not funded by the government ... or to cover deficits so [ARC] can continue operating the programs that [its] mission dictates [it] operate." (R.R. at 107a–08a.) Mr. Scrip also testified, however, that ARC uses "funds from other places to cover those deficits." (R.R. at 114a.) On cross-examination, counsel for the County asked Mr. Scrip about the charitable contributions ARC received from its parent company, AAdvantage, Inc.:

Q. Are those contributions restricted in any fashion?

A. The contributions from AAdvantage for that year, I do not believe, were restricted. They were not loans. None of this had to be paid back.

Q. What were their sources?

A. The sources from AAdvantage, Inc., were probably a surplus that AAdvantage, Inc., ran and distributed back down though the subsidiaries.

Q. But how does it get its money?

A. AAdvantage, Inc., is a management service company that provides services to the subsidiaries, as well as other companies throughout.

Q. Which means ARC pays AAdvantage, Inc., for management services, correct?

A. Yes.

(R.R. at 135a–36a.) Mr. Scrip's testimony indicated, for example, that ARC paid AAdvantage, Inc., approximately one million dollars for management services in 2011 and AAdvantage, Inc. contributed $293,000 to ARC during that year. (R.R. at 136a.)

In describing how ARC donates or renders gratuitously a substantial portion of its services, Mr. Scrip testified:

In doing the rendering of the services gratuitously, there are several services that we provide that we do not get reimbursed for throughout the year, as well as when we run deficits. Obviously we are providing services there gratuitously because our costs are not fully recovered at 100 percent of what it costs us. For instance, one example, in fiscal year 2011–12 ARC provided services, residential services to some residents ... [a]nd we were shorted over $60,000 ... for those services, but did not find out for a year that we would not be paid for those services, which [a governmental entity] authorized [ARC] to provide. And we did provide them. So, right there's one

example of providing, in my opinion, gratuitously services to the [C]ounty. (R.R. at 108a.)

Mr. Scrip also testified by reference to ARC's Exhibit G, regarding matters mentioned on ARC's web site as constituting the donation or gratuitous rendering of services. Mr. Scrip testified that ARC's donated or gratuitously rendered services included

> advocacy to the families of individuals throughout all of the areas that [ARC] serves, and other areas which we may not be in, as well. This advocacy will help individuals and their families find services such as ... where you may find health insurance or a psychiatrist or psychologist, medical services, transportation, et cetera. We also do presentations for many groups such as the Rotary, [Kn]ights of Columbus and PA Fraternal lines. ARC operates a club where individuals of any age can go throughout the year to receive services. They go on outings, special activities, et cetera. That's called Club ARC. We also provide a camp called Camp Laughalot where individuals with disabilities come throughout the summer months and are provided with a camp structure and activities. And finally, we do a lot of fund-raising activities such as a golf outing, restaurants, donate nights or days worth of grocery receipts, a certain percentage of grocery receipts. We sell candy bars. We do Easter flowers. We do all kind[s] of different things like that. We also offer, ARC works with students which helps the school-age children and families and provide[s] them with the services they need and direction they need.

(R.R. at 109a–10a.)

Mr. Scrip testified that ARC's housing does not constitute "low-income" housing and that residents do not pay rent subsidized by the federal government. (R.R. at 122a.) With regard to the costs associated with residential life through ARC's group homes, Mr. Scrip testified:

> ARC receives money from the individual residents based on a formula set by the Commonwealth ... in Chapter 51 of our regulations. What it states is that ARC is permitted and must be paid by the individuals living in the homes up to 72 percent of their monthly Social Security income that they receive.... There is a room-and-board contract that the state developed that all providers are required to use. So we have to charge them. It's considered room and board to help pay for costs such as all occupancy costs, such as the mortgage, all the utilities, building maintenance and repair, the food. There's a lot of different costs that go into that.

(R.R. at 116a.) Mr. Scrip testified that ARC receives government funding, but that the funding was only between 88 and 90 percent of the cost to provide its services over the three-year 2011–2013 fiscal period. (R.R. at 112a.) Mr. Scrip's testimony in this regard is unclear, however, because he later testified that ARC receives a $32 daily per capita payment for each resident, but he did not quantify (in percentage of ARC's total costs) how this additional funding assists in meeting ARC's financial requirements.

The trial court found that ARC failed to produce "concrete evidence or testimony ... to establish that ARC makes any *bona fide* effort to offer its services to those who are unable to pay." (Trial Court op. at 8.) The trial court found that while the testimony indicated that "most" of ARC's residents contribute the maximum 72% of their social security payments toward the cost of housing, there was no firm evidence regarding whether any of ARC's residents pay nothing for the costs of living in an

ARC group home. Thus, the trial court opined that ARC's failure to demonstrate that a substantial segment of its residents do not pay the full costs of obtaining ARC's services supported the conclusion that ARC does not donate or render gratuitously a substantial portion of its services. We find no error with the trial court's determination in this regard. ARC's evidence showed that its residents contribute a percentage of their Medicaid payments and that the Department of Public Welfare makes per diem payments to ARC for each resident, but that evidence does not conclusively show that ARC provides services to some individuals who cannot afford to pay in full for ARC's services, *cf. St. Margaret*, or that ARC accepts residents regardless of ability to pay for the cost of living in one of ARC's group homes.

Second, as suggested above, Mr. Scrip's testimony was incomplete or ambiguous regarding the relative revenue from *all* government sources and the cost of providing care to ARC's residents. After testifying about the requirement that residents contribute 72% of their Medicaid payments and the state's $32 daily per capita contribution, Mr. Scrip did not explain the extent to which those two apparently primary sources of revenue meet ARC's operating costs. Mr. Scrip's testimony failed to describe exactly what the difference is between costs of service and total government funding. Additionally, while Mr. Scrip testified that ARC receives money as charitable donations from

its parent corporation and from some fundraising activities, the trial court determined that such contributions were negligible. Moreover, Mr. Scrip testified additionally that money from other group homes covered the deficits of the two Clearfield County group homes about which he testified.[4] (R.R. at 114a.) Thus, the evidence is not clear regarding whether ARC, as an institution, was able to pay for all of its institutional residents notwithstanding a deficit experienced by the two Clearfield County group homes.

The trial court acknowledged Mr. Scrip's testimony concerning various gratuitously rendered services, such as advocacy to families that help families find services such as transportation and medical services, ARC's Club ARC, and ARC's Camp Laughalot. The trial court characterized these activities as "admirable," but it again viewed the testimony to be insufficient to establish that ARC provided the services free of charge to all residents.[5] (Trial Court op. at 9.)

Although our decision in *Fayette Resources* contains some factual distinctions, this case is similar to *Fayette Resources*, because the evidence in this case does not clearly demonstrate that the government funding ARC receives is insufficient to fully fund ARC's institutional costs. *Fayette Resources*, 107 A.3d at 847. Thus, in looking at the evidence of ARC's institutional financial situation, the trial court could reasonably conclude that the evidence did

4. Mr. Scrip testified regarding specific deficit amounts only with respect to the Clearfield County facilities, which for the three-year period totaled $190,626. (R.R. at 113a–14a.).

5. The trial court also concluded that the evidence ARC submitted regarding its camp program did not support ARC's claim to be an IPPC. The trial court reached this conclusion because the programs were not specifically designed for ARC's residents. We are not

persuaded that this detail detracts from an entity's claim to be an IPPC. While ARC's primary purpose may relate to housing of mentally challenged adults, the gratuitous rendering of services that may be less contextually related to an entity's primary goal may nevertheless support a claim that an entity is an IPPC, because the operation of such programs might further the charitable goals of an entity.

not clearly show that ARC, as an institution, bore substantial costs over and above the revenue it received. The trial court reasoned that, unlike other cases involving the second *HUP* criteria, ARC failed to provide unambiguous evidence that demonstrates exactly how and the degree to which it donates services. As in *WRC,* wherein this Court suggested that the exemption-seeking entity was essentially a conduit, receiving payment from the government for the services it provided, *WRC,* 917 A.2d at 899, the trial court in this case determined that ARC appears to receive payment from residents up to a certain percentage of Medicaid payments a resident receives and ARC receives a subsidy from the Commonwealth of approximately $32 per day per resident. Additionally, the trial court considered the evidence suggesting that the management payments ARC pays to its parent company flow back to ARC as purported "charitable contributions."

ARC argues that the use of the flat-rate percentage fee it charges Medicaid residents results in ARC subsidizing its residents. As indicated above, however, unlike the evidence in *St. Margaret,* the evidence in this case is vague regarding any actual payments that ARC foregoes or which it pays and does not recover in order to provide its residents with its services. Although there may be similarities between this case and *St. Margaret,* there are also, however, significant distinctions. For example, unlike the evidence in this case, in *St. Margaret,* the entity seeking exemption demonstrated that it bore one-third of its costs to provide care to its residents and that Medicaid only paid part of the costs of care for forty-eight percent of its residents.

We conclude that the trial court did not err in concluding that ARC failed to demonstrate that it donates or renders gratu-itously a substantial portion of its services. The trial court, as fact finder, has the sole power to weigh the evidence, and in this matter, did not find sufficient evidence to support ARC's claim that it donated or rendered gratuitously a substantial part of its services to the individuals it serves. *See St. Margaret,* 640 A.2d at 383 (appellate court may not disturb trial court's factual findings on appeal when supported by substantial evidence). Based upon gaps in evidence, which ultimately paint an incomplete picture of the revenue and costs associated with living in an ARC group home and the costs to ARC of providing services, we conclude that the trial court did not err in determining that ARC failed to satisfy its burden of proof regarding the second *HUP* requirement.

■ ARC's final argument is that the trial court employed an improper evidentiary standard, because the trial court, referencing our decision in *Menno Haven, Inc. v. Franklin County Board of Assessment & Revision of Taxes,* 919 A.2d 333, 335 (Pa.Cmwlth.2007), *appeal denied,* 596 Pa. 711, 940 A.2d 367 (2007), wrote that an entity seeking a tax exemption under *HUP* bears a heavy burden. ARC argues that although the courts have referred to the burden to prove an exemption as a "heavy burden," the courts have used the phrase with regard to the requirement to satisfy all five elements of the *HUP* test. On the other hand, ARC argues, a trial court reviewing evidence with regard to the individual elements, must review the totality of the circumstances pertaining to each element, as established by the evidence submitted. ARC contends that in this case, the trial court's opinion suggests that it analyzed the evidence ARC submitted under a "heavy burden" analysis rather than considering the "totality of the circumstances."

We disagree. In this case, the trial court recognized the "totality of the circumstances" standard [6] as the proper standard for determining whether an entity has donated or rendered services that are "substantial"—a term that the courts have deemed not to be subject to a strict percentage. *Appeal of Sewickley Valley YMCA of the Decision of the Board of Property Assessment,* 774 A.2d 1, 8 (Pa. Cmwlth.2001). The trial court considered the evidence ARC submitted regarding payments residents make to cover the costs of room and board, state payments for each resident, evidence concerning ARC's advocacy services and camps, deficits experienced by the County facilities, the organizational structure of ARC and ARC's relationship to its affiliates and parent companies, fundraising activities, and contributions made to ARC's County facilities in order to ensure ARC's ability to meet the needs of its County residents. We believe that the trial court's opinion demonstrates that it engaged in a proper analysis of the evidence and applied the proper standard in reviewing the evidence.

Accordingly, we affirm the trial court's orders.

### ORDER

AND NOW, this 13th day of July, 2015, the orders of the Court of Common Pleas of Clearfield County are AFFIRMED.