**FELLOWSHIP INTERNATIONAL MISSION, INC., Appellant,**

v.

**LEHIGH COUNTY BOARD OF ASSESSMENT APPEALS and County of Lehigh.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Dec. 9, 1996.

Decided March 6, 1997.

Frederick J. Lanshe, Allentown, for appellant.

Ronald E. Corkery, Assistant County Solicitor, Allentown, for appellees.

Before COLINS, President Judge, · DOYLE, J., and LORD, Senior Judge.

DOYLE, Judge.

Fellowship International Mission, Inc. (Mission) appeals an order of the Court of Common Pleas of Lehigh County, which affirmed a decision of the Lehigh County Board of Assessment Appeals (Board) denying the Mission's request for a charitable exemption from the real estate tax.

## BACKGROUND

The Mission is a nonprofit corporation founded to proclaim the Gospel through missionary work and is a member of the Independent Fundamental Churches of America. The Mission owns real property located at 555 South 24th Street, in the City of Allentown, Lehigh County. The property was purchased in August of 1992 and contains a two-story brick building. The Allentown property is used by the Mission as a missionary training academy, administrative offices, and as a residence for missionaries. Religious prayer services are also conducted on the property for the Mission's staff and for the missionary candidates.

Specifically, the Mission engages in the following activities: training persons to perform missionary work; making travel arrangements and obtaining visas to allow missionaries to enter foreign countries; debriefing missionaries returning from their assignments; providing dormitory space for missionaries; and overseeing the financial needs of missionaries. At the time of the final hearing before Common Pleas, the Mission was in charge of the finances of nearly 138 missionaries in 22 foreign countries, as well as in the United States.

The work performed by the missionaries, trained and supported by the Mission, involves, among other things, establishing churches, running orphanages, operating educational programs through seminaries, distributing literature, and operating radio ministries. Those activities, however, are only performed in foreign countries. The missionaries working in the United States are engaged in evangelizing international students, primarily in the Washington, D.C. area.

The Mission has no endowment and provides no grants to missionaries. To become a missionary, a person must solicit their own financing, generally by being sponsored by their local church, neighboring churches, friends and family. The money raised is given to the Mission, not directly to the missionary, but is designated for the use of that missionary. The Mission places the money into a separate account, which the Mission administers, and the money is used for the expenses of the missionary. If the missionary exhausts the funds raised, the missionary must cease his or her work or find additional financing. The Mission funds its professional staff and facilities by deducting 10% from the funds generated by each missionary. For the year ended June 30, 1993, the Mission had accumulated approximately $1,220,000 and retained $122,000 in fees for its services.

## PROCEDURAL HISTORY

In August of 1993, the Mission petitioned the Board for a charitable exemption from the real estate tax. After a hearing, the Board denied the exemption, and the Mission appealed that decision to Common Pleas. The Mission asserted that the Board erred in denying it a real estate tax exemption, because, *inter alia*, it presented sufficient evi-

dence at the Board hearing to demonstrate that it was a purely public charity.

Common Pleas, applying the test articulated in *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985) (hereinafter *HUP*), denied the Mission's appeal. In *HUP*, the Supreme Court identified the following five factors as relevant when determining whether a particular organization qualifies as a purely public charity:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free of the profit motive.

*Id.* at 22, 487 A.2d at 1317.

Here, Common Pleas determined that the Mission did not donate a substantial portion of its services gratuitously, but, instead, charged the missionaries and missionary candidates exactly what the Mission's services cost. While the Mission argued that the missionaries it oversees provide gratuitous services to needy persons all over the world, Common Pleas rejected that argument, because the missionaries are not employees of the Mission. Common Pleas reasoned:

> The men and women who are *trained* at the Mission (and de-briefed and temporarily housed) are not employees of the Mission. These are not ministers or priests on the Mission's payroll. The individuals performing gratuitous works around the world may be technically 'members' of the Mission, but that does not entitle the Mission to take credit for their work. In the same manner a University does not obtain its charitable exemption because of the good works of its faculty or students—its tax forgiveness results from scholarships and other forms of charity coming out of

its own resources. A Hospital cannot claim the hours spent by its volunteers (who it trains) as a part of its substantial portion of gratuitous services.... Those volunteers are spending time to help the sick, not the Hospital. Under the Taxpayer's theory, parents could claim a tax exemption when one of their children became a volunteer. That child would be a member of the family who had been trained to do good works.

(Trial Court Opinion at 2–3.) (Emphasis in original; citation omitted.) This appeal followed.

## ISSUES

The Mission contends that Common Pleas erred in holding that the Mission did not donate or render gratuitously a substantial portion of its services and, for that reason, did not qualify as a purely public charity.[1] It argues that the gratuitous works of the missionaries are an integral part of the Mission's work and that it should be entitled to the benefit of those works when determining whether the Mission qualifies as a purely public charity.

## DISCUSSION

 Article 8, Section 2 of the Pennsylvania Constitution gives the General Assembly the power to exempt institutions of purely public charity from taxation. The General Assembly, based on that grant of authority, enacted Section 204 of the General County Assessment Law (Law),[2] which allows counties to confer a real estate tax exemption on purely public charities. An organization does not qualify as a purely public charity merely because it is a nonprofit corporation, and it is irrelevant whether the organization is recognized as a tax-exempt charity for federal income tax purposes. *Sacred Heart Healthcare System v. Commonwealth*, 673 A.2d 1021 (Pa.Cmwlth.1996). Our Supreme Court has decreed that in order to qualify as a public charity under Section 204 of the Law,

---

1. The question of whether an institution is a purely public charity, exempt from taxation, is a mixed question of law and fact; the common pleas court's decision is binding absent an abuse of discretion or lack of supporting evidence. *Appeal of Capital Extended Care*, 148 Pa.Cmwlth. 128, 609 A.2d 896 (1992).

2. Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–204.

an institution must satisfy the test articulated in *HUP*, and it is the taxpayer who bears the burden of proving that it is entitled to the exemption and must satisfy all five criteria of the *HUP* test to qualify as an institution of purely public charity. *Associated YM–YWHA of Greater New York/Camp Poyntelle v. County of Wayne,* 149 Pa. Cmwlth. 349, 613 A.2d 125 (1992).

In addition to the *HUP* test, an applicant must satisfy Section 204(a) of the Law,[3] 72 P.S. § 5020–204(a)(3), which provides the following relevant standard for tax exempt real property:

> (a) The following property shall be exempt from all county, city, borough, town, township, road, poor, or school tax, to wit:
> 
> . . . .
> 
> (3) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning benevolence, or charity . . . founded, endowed and maintained by public or private charity: Provided that the entire revenue derived by the same be applied to support and to increase the efficiency and facilities thereof, and for no other purpose. . . .

▆ The Mission challenges the decision of the Court of Common Pleas inasmuch as the court determined that the Mission failed the *HUP* test, and thus did not qualify as a purely public charity, because the Mission failed one prong of the test,—namely, whether the Mission donated or rendered gratuitously a substantial portion of its services. Neither of the parties in this appeal contend that Common Pleas erred in holding that the Mission satisfied the remaining four elements of the *HUP* test, and, accordingly, our analysis will focus solely on that one relevant element of the standard.

▆ In order to satisfy its burden of demonstrating that it donates or renders gratuitously a substantial portion of its services, an organization must demonstrate that it makes a bona fide effort to service those persons unable to afford the usual fee. In other words, it must be shown that it pro-

vides services to someone who cannot afford to pay. *Appeal of Capital Extended Care.* Here, nothing in the record reveals that the Mission provides services to any person who cannot afford to pay for its missionary training or support services. The missionaries must establish their own financial security, by having donors pledge money to the Mission, before the Mission will offer any training or support services. The money raised by the missionary is used to provide for his or her living expenses in the assigned foreign country, and if the missionary exhausts those funds, more money must be generated by the missionary or the missionary must return home. The Mission's services are paid for by deducting 10% from the funds raised by each missionary, which, as found by Common Pleas, is "exactly what its services cost." (Order of October 13, 1995, at 4 n. 1.) The Mission provides no free services to the missionaries or to anyone else.

In the absence of evidence demonstrating that the Mission donates any of its services to the missionaries, we are constrained to hold that Common Pleas correctly concluded that the Mission failed this element of the *HUP* test. *Appeal of Marple Newtown School District,* 500 Pa. 160, 455 A.2d 98 (1982) (retirement community was not entitled to a charitable tax exemption, when financial security was a prerequisite to the admission of all residents). *Compare City of Washington v. Board of Assessment Appeals of Washington County,* 666 A.2d 352 (Pa. Cmwlth.1995), *petition for allowance of appeal granted,* 545 Pa. 672, 681 A.2d 1344 (1996) (college rendered gratuitously a substantial portion of its services by providing grants to students based upon demonstrated financial need and by awarding academic scholarships). Thus, because the Mission did not establish that it satisfied every element of the *HUP* test, Common Pleas properly concluded that the Mission was not entitled to a tax exemption as a purely public charity.

▆ The Mission argues, however, that the charitable, gratuitous work performed by the missionaries should be considered when

---

**3.** The Mission does not assert in this appeal that it is entitled to an exemption under Section 204(a)(1) of the Law, which exempts "[a]ll

churches, meeting houses, or other places of regularly stated religious worship . . . ." from local real estate taxes. 72 P.S. § 5020–204(a)(1).

determining whether it satisfies the *HUP* test.

This Court has held that institutions cannot rely on the good works of other related, yet independent, institutions to satisfy the elements of the *HUP* test. In *Sacred Heart*, a nonprofit corporation that provided management services to a limited group of clients, which were affiliated nonprofit corporations, could not rely on the charitable activities of its client corporations to satisfy the *HUP* test. Because corporations are institutional persons, and are thus independent entities, the corporate entity seeking the charitable tax exemption may not base that exemption on the works of others. Furthermore, in *Appeal of the Northwestern Corporation from the Dauphin County Board of Assessment Appeals,* 665 A.2d 856 (Pa. Cmwlth.1995), we rejected a taxpayer's argument that, for purposes of deciding whether the taxpayer was entitled to a charitable exemption from the property tax, the activity of an independent subsidiary corporation should be considered along with the activities of the taxpayer. We held that it is illogical to include the activities of a distinct corporate entity, located on a different parcel of land, into the *HUP* analysis, because the property tax issue concerned only the activities of the taxpayer on the parcel of land subject to taxation.

In the present case, while there is testimony that the missionaries are designated as being from the Mission, there is no evidence in the record indicating that the missionaries are the employees of the Mission, or that the missionaries are members of a corporate religious order which itself provides for their welfare. Instead, the evidence reveals that the missionaries are, in essence, clients [4] of the Mission, in that individuals from numerous independent churches use the professional expertise and services of the Mission to realize their religious goal of working as a missionary. As such, the missionaries cannot be considered an integral part of the Mission.

In our view, the relationship between the Mission and the missionaries is analogous to the situation in *Sacred Heart*, where the

taxpayer, a management service corporation, provided professional services to client corporations. In *Sacred Heart*, we expressly held that the taxpayer could not qualify as a purely public charity based on the activities of its client corporations. Therefore, following *Sacred Heart*, we hold that the Mission cannot rely on the gratuitous works of the missionaries to demonstrate that it donates a substantial portion of its services. Accordingly, Common Pleas did not err in holding that the services donated by the missionaries cannot be deemed the donations of the Mission.

We recognize that in *Order of Franciscan Fathers of Green Bay, Wisconsin v. Board of Property Assessment & Review,* 111 Pa. Cmwlth. 524, 534 A.2d 568 (1987), we held that the missionary work of Franciscan priests and brothers qualified the organization as a purely public charity and entitled the order to a real estate tax exemption, even if the missionaries performed no social outreach work. However, unlike the missionaries served by Mission, who are individuals from diverse churches which are utilizing the expertise of the Mission to realize their goals, the missionaries in *Order of Franciscan Fathers* were priests and monks who were integral members of a religious order which provided for their welfare. Further, *nothing in Order of Franciscan Fathers* suggests that the priests and monks were required, as a prerequisite to entering the priesthood or performing missionary work, to raise funds to support their missionary work and training, or that the Franciscan order functioned merely as a support organization for priests engaged in missionary work. Therefore, *Order of Franciscan Fathers* is not controlling in this case.

Moreover, while *Order of Franciscan Fathers* was decided subsequent to *HUP,* inexplicably, the case did not discuss or apply the *HUP* test. In the absence of a discussion of *HUP, Order of Franciscan Fathers* is not precedential on the question of whether missionary work satisfies all the elements of the

---

**4.** A client is generally defined as an individual who employs a professional to provide advice

and assistance. *Black's Law Dictionary* 254 (6th ed.1990).

*HUP* test.[5]

Accordingly, we hold that Common Pleas did not err in denying the Mission a charitable exemption from the real estate tax.

Order affirmed.

### ORDER

**AND NOW,** March 6, 1997, the order of the Court of Common Pleas of Lehigh County in the above-captioned matter is hereby affirmed.

**LIBERTY ASSOCIATES, Appellant,**

v.

**BOARD OF SUPERVISORS OF HUNTINGTON TOWNSHIP.**

Commonwealth Court of Pennsylvania.

Argued Dec. 10, 1996.

Decided March 6, 1997.

James D. Hughes, Carlisle, for appellant.

Robert E. Campbell, Gettysburg, for appellee.

Before DOYLE and SMITH, JJ., and RODGERS, Senior Judge.

DOYLE, Judge.

Liberty Associates appeals from an order of the Court of Common Pleas of Adams County, quashing Liberty Associates' appeal, for lack of standing, from a decision of the Board of Supervisors of Huntington Township (Board) rejecting a subdivision plan.

On May 30, 1995, John Fox and Harry H. Fox, Jr., who are brothers, submitted two subdivision plans, dated April 21, 1995, to the Huntington Township Planning Commission. The two subdivisions were known as "The Meadows" and "Huntington Fields." Nowhere on the subdivision plans was the entity Liberty Associates mentioned as having any proprietary interest in the subject proper-

---

**5.** The Mission cites to other cases, decided before *HUP*, in support of its argument. *Pittsburgh Bible Institute v. Board of Property Assessment Appeals,* 405 Pa. 297, 175 A.2d 82 (1961); *Board of Home Missions and Church Extension of the Methodist Episcopal Church v. Philadelphia,* 266 Pa. 405, 109 A. 664 (1920); *Laymen's Weekend* *Retreat League,* 21 Pa.Cmwlth. 175, 343 A.2d 714 (1975). Our review of the above cases, however, reveals that those decisions focused on the question of whether the organization seeking the exemption was organized for a charitable purpose, the first prong of the *HUP* test, and did not

consider every element of the present *HUP* test. Thus, they do not control the outcome here.