APPEAL OF THE SEWICKLEY VAL-
LEY YMCA OF THE DECISION OF
THE BOARD OF PROPERTY AS-
SESSMENT, APPEALS AND RE-
VIEW OF THE PROPERTY OWNED
BY THE SEWICKLEY VALLEY
YMCA LOCATED IN SEWICKLEY
BOROUGH, QUAKER VALLEY
SCHOOL DISTRICT, COUNTY OF
ALLEGHENY

BOROUGH OF SEWICKLEY,
Appellant.

Commonwealth Court of Pennsylvania.

Argued Feb. 6, 2001.
Decided April 18, 2001.

Bradley S. Tupi, Pittsburgh, for appellant.

Stanley J. Parker, Pittsburgh, for appellee.

Before DOYLE, President Judge, COLINS, Judge, JIULIANTE, Senior Judge.

JIULIANTE, Senior Judge.

The Borough of Sewickley (Borough) appeals from the April 19, 2000 order of the Court of Common Pleas of Allegheny County (trial court) that affirmed in part and reversed in part the decision of the Allegheny County Board of Property Assessment, Appeals and Review (Board). In a decision dated November 18, 1997, the Board lifted the Young Men's Christian Association's (YMCA) tax-exempt status for 1993 and all subsequent years. The trial court reversed that portion of the Board's order denying the YMCA tax-exempt status for 74,031 square feet of YMCA property and affirmed that portion of the Board's order denying the YMCA tax-exempt status for 6,519 square feet of YMCA property. The issue in this case is whether the YMCA qualifies as a "purely public charity" in order to be eligible for tax-exempt status for its real estate. For the reasons that follow, we affirm.

The YMCA is a Pennsylvania non-profit corporation that has been in continual operation since 1894. (Trial court opinion, p. 1) The stated mission of the YMCA is "to build healthy spirit, mind and body based on Christian principles, and to improve the quality of life for children, individuals, and families in the Quaker Valley and neighboring communities." (*Id.*)

The YMCA owns three parcels of land in the Borough, which until 1997, enjoyed tax-exempt status as a "purely public charity" pursuant to Section 204 of The General County Assessment Law (Law).[1] The YMCA's main building was constructed in 1904 and was thereafter expanded twice, in 1968 and 1990. (Trial court opinion, p. 1) The total square footage of the indoor space now equals 80,550 square feet. Its outdoor facilities include athletic fields, tennis courts and parking lots. (*Id.* at p. 2)

In 1990, the YMCA renovated one of its properties, which resulted in the relocation of its fitness club (Fitness Center). (*Id.*) The Fitness Center's amenities are similar to those found in for-profit private health facilities and are located in 5,497 square feet of the YMCA building. (*Id.*) In addition, the YMCA leases 1,022 square feet to D.T. Watson Rehabilitation Center (D.T.Watson). (*Id.* at p. 4)[2] D.T. Watson pays the YMCA a yearly rental fee plus a percentage of its total yearly receipts. (*Id.*) Thus, a total of 6,519 square feet of the YMCA's building houses the Fitness Center and D.T. Watson.

In 1993, the Borough filed a tax appeal with the Board and, as a result, on November 18, 1997, the Board lifted the YMCA's tax-exempt status for 1993 and all subsequent years. The YMCA appealed to the trial court, which then held a *de novo* hearing on the matter July 12–14, 1999. On April 19, 2000, the trial court issued an order affirming in part and reversing in part the Board's decision. Specifically, the trial court affirmed that portion of the Board's order determining that the square footage housing the Fitness Center and D.T. Watson was not tax-exempt. It reversed the Board in all other respects.[3] Essentially, the trial court found 74,031 square feet of the YMCA to be tax-exempt and the remaining 6,519 square feet (representing the Fitness Center and D.T. Watson) to be subject to tax. This appeal followed.

On review, the Borough presents three issues for our consideration: (1) whether the trial court erred in determining that the YMCA met its burden of proof as pronounced in *Hosp. Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985) (*HUP*) for tax years 1993 through 1997; (2) whether the trial court erred in concluding that the YMCA met the community service requirements of Section 5(d) of the Institutions of Purely Public Charity Act (Act);[4] and (3) whether the trial court erred in calculating the taxable square footage of the YMCA's Fitness Center and D.T. Watson. Our scope of review in a real estate tax assessment appeal is limited to determining whether the trial court's findings are supported by substantial evidence or whether the trial court abused its discretion or committed

---

1. Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. § 5020–204.

2. The trial court erroneously stated that D.T. Watson occupies 1,020 square feet of the YMCA building.

3. By order dated May 17, 2000, the trial court amended its April 19, 2000 order to clarify that it found 6,519 square feet of the YMCA's building to be subject to real estate taxes.

4. Act of November 26, 1997, P.L. 508, *as amended,* 10 P.S. § 375(d).

an error of law. *Lewistown Hosp. v. Mifflin County Bd. of Assessment Appeals,* 706 A.2d 1269 (Pa.Cmwlth.1998).

Article VIII, Section 2(a)(v) of the Pennsylvania Constitution provides:

(a) The General Assembly may by law exempt from taxation:

. . .

(v) Institutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution.

PA. CONST. art. VIII, § 2(a)(v).

Accordingly, the General Assembly enacted the Law, which provides in Section 204:

(a) The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:

. . .

(3) All ... associations and institutions of learning, benevolence, or charity ... with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereto, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose....

Section 204 of the Law, 72 P.S. § 5020–204.

In *HUP*, our Supreme Court enunciated the standard that an entity must meet in order to qualify as a "purely public charity:"

(a) it advances a charitable purpose;

(b) it donates or renders gratuitously a substantial portion of its services;

(c) it benefits a substantial and indefinite class of persons who are legitimate objects of charity;

(d) it relieves the government of some of its burden; and

(e) it operates entirely free from private profit motive.

*Id.* at 22, 487 A.2d at 1317.

 In November of 1997, the General Assembly enacted the Act, which essentially codified the *HUP* standards in Section 5(b-f) of the Act, 10 P.S. § 375(b-f). In addition, we note that the entity asserting the status of a purely public charity shoulders the burden of proof.[5] *St. Joseph Hosp. v. Berks County Bd. of Assessment Appeals,* 709 A.2d 928 (Pa.Cmwlth.1998). The question of whether an entity is entitled to the exemption is a mixed one of law and fact, which absent an abuse of discretion or lack of substantial evidence, we will affirm. *Lewistown Hosp.*

## I. Whether the YMCA sustained its burden of proof under *HUP* and the community service requirements of Section 5(d) of the Act, 10 P.S. § 375(d).

*Charitable Purpose*

The Borough's first argument on appeal is that the trial court erred in determining that the YMCA advances a charitable purpose under *HUP* and the Act. Specifically, the Borough complains that the trial

---

5. Pursuant to Section 6(a) of the Act, 10 P.S. § 376(a), if an institution with less than $10,000,000.00 in yearly program revenue possesses a valid exemption from taxes imposed by Section 204(10) of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. § 7204(10), it is entitled to a rebuttable presumption that it is in compliance with Section 5 of the Act. The YMCA, however, did not present such an exemption.

court erred in relying on the purely public charity status of other YMCAs and the Sewickley YMCA's open admissions policy.

■ Citing *Couriers–Susquehanna, Inc., v. County of Dauphin,* 165 Pa. Cmwlth. 192, 645 A.2d 290 (1994), the Borough complains that the trial court relied on the charitable status of other YMCAs in concluding that the Sewickley YMCA advances a charitable purpose when, in fact, each tax exemption case must be made upon the entity's own unique factual composition. While we agree with the Borough's general position, we see no error in the trial court's acknowledgment that other YMCAs have been recognized as charitable institutions. We recognize that one purpose of appellate case law is to provide lower courts with guidance when presented with factually similar circumstances. To state that the trial court improperly considered factually similar cases would undermine the value of legal precedence.

■ The trial court further cited the Sewickley YMCA's open admissions policy as evidence of its charitable purpose. The Borough complains, however, that the YMCA needs to serve the general public rather than "privileged" individuals who can afford YMCA memberships. The YMCA has two types of membership: full members and limited members. Full members pay a yearly fee in addition to a one-time capital development fee and have full access to all of the YMCA's facilities (with the exception of the Fitness Center). (Reproduced Record "R.R." 41a, 255a) Limited members are those YMCA members that participate in YMCA programs on an *a la carte* basis. (R.R. 41a) Limited members select programs that they would like to participate in and pay only for that program. (*Id.*) Limited members do not have full access to the YMCA's facilities. According to the Borough's statistics, 95% of the YMCA's membership is comprised of full and limited members and therefore, only 5% of the general public is served.

The term "charitable" includes

> every gift for a general public use, to be applied, consistent with existing laws, for the benefit of an indefinite number of persons, and designed to benefit them from an educational, religious, moral, physical or social standpoint. In its broadest meaning it is understood "to refer to something done or given for the benefit of our fellows or the public."

*HUP* at 18, 487 A.2d at 1315 (citation omitted).

Colleen Fedor, Executive Associate Director of the YMCA, testified that the YMCA's mission is to help "people reach their best potential through education, fitness and social interaction." (R.R. 39a) To achieve this goal, Ms. Fedor testified that all individuals, regardless of race, color, national origin, religious affiliation, or ability to pay, are welcome at the YMCA. (R.R. 43a–44a) She further stated that the YMCA takes positive steps to make the community aware of its services by contacting local school districts and religious organizations and asking them to advise their community members of the YMCA's services and availability. (R.R. 45a)

While the Borough focuses on the percentage of YMCA members who are given reduced or free memberships, it wholly ignores the non-YMCA members of the community who are served. Ms. Fedor testified at length regarding community services and programs that are sponsored by the YMCA and that are not part of the traditional membership. The YMCA allows several school districts to use its swimming pools and activity fields for both practices and tournament games. The YMCA sponsors health fairs for adults and children, free of charge to anyone in the community. It sponsors and subsidizes

food drives that benefit local shelters and school districts. The YMCA offers Learn to Swim and water safety programs for children at no cost to the participant. Without belaboring the point, the YMCA offers its facilities and staff to non-YMCA members of the community in a variety of ways, at either no cost or minimal cost to the participant. (*See* R.R. 46a–103a)

The Borough did not offer any evidence rebutting Ms. Fedor's testimony regarding the outside community services offered by the YMCA. Certainly, the YMCA through its endeavors has given back to the community and continues to offer programs for the use, enjoyment and benefit of the community as a whole, regardless of the participant's membership status.

Under the Act, in order to meet the charitable purpose requirement, the institution must demonstrate that it fulfills any one of the following purposes:

> (1) relief of poverty;
>
> (2) advancement and provision of education (including post-secondary education);
>
> (3) advancement of religion;
>
> (4) prevention and treatment of disease or injury, including mental disorders;
>
> (5) government or municipal purposes; or
>
> (6) accomplishment of a purpose that is recognized as important and beneficial to the public and that advances social, moral or physical objectives.

Section 5(b) of the Act, 10 P.S. § 375(b).

The trial court found, and we agree, that the YMCA satisfies at least subsections (2), (3) and (6) of Section 5(b) of the Act. The YMCA offers preschool and childcare programs, encourages Christian beliefs, and advances social, moral and physical objectives though its community and membership programs and its fitness facilities. Accordingly, we conclude that the trial court did not err in finding that the YMCA satisfies the charitable purpose requirements of *HUP* and the Act. *See Dynamic Sports Fitness Corp. of America, Inc., t/a The Sports Club v. The Community of YMCA of Eastern Delaware County, the Ridley Area YMCA Branch,* 768 A.2d 375 (Pa.Cmwlth.2001)(presence of commercial health club, as defined by the Act, in the Delaware County YMCA is related to its charitable purposes of promoting good health, strengthening of family ties and values, citizenship, leadership, individual awareness, good character, volunteerism and national and international understanding).

*Rendering Gratuitously a Substantial Portion of its Services*

■ The second prong of *HUP* requires that an entity render gratuitously a substantial portion of its services. The Borough complains that YMCA scholarships [6] offered to members and volunteer services to the community are not out-of-pocket expenses to the YMCA and are not substantial when compared to its total revenue.

■ As the trial court noted, the fact that an entity accepts payments for its services does not negate its status as a charitable institution. *City of Washington v. Bd. of Assessment Appeals of Washington County,* 550 Pa. 175, 704 A.2d 120 (1997); *St. Margaret Seneca Place v. Bd. of Property Assessment, Appeals and Re-*

---

6. In calculating the amount of scholarships it provides per year, the YMCA includes memberships given at reduced fees or completely free of charge. For example, if the YMCA's regular yearly membership fee is $100.00 and the member is only able to pay $40.00 of that fee from his own funds, the YMCA considers that it has given a scholarship in the amount of $60.00.

8

*view,* 536 Pa. 478, 640 A.2d 380 (1994)(collection of fees is appropriate since charities need not provide services that are wholly gratuitous); *Presbyterian Homes Tax Exemption Case,* 428 Pa. 145, 236 A.2d 776 (1968)(receipt of payment for services does not conflict with status as purely public charity); *Hill Sch. Tax Exemption Case,* 370 Pa. 21, 87 A.2d 259 (1952)(educational institution that levies tuition charges does not thereby lose its status as a purely public charity).

To illustrate its position that the YMCA does not gratuitously render a substantial portion of its services, the Borough offers that in 1994, the YMCA received $1,950,-000.00 [7] in membership and program fees and only awarded $136,430.00 in scholarships, or 7% of its revenue. The Borough maintains that this amount is so inconsequential that it could be covered by the YMCA's annual profits. According to the Borough, the YMCA's program and membership fees generate excess revenue each year greater than the annual value of its scholarships or volunteer services.

▮▮ In order to satisfy its burden of demonstrating that it donates or renders gratuitously a substantial portion of its services, an entity must show that it makes a bona fide effort to service those persons who are unable to afford the usual fee. *Fellowship Int'l. Mission v. Lehigh County Bd. of Assessment Appeals,* 690 A.2d 1271 (Pa.Cmwlth.1997). "In other words, it must be shown that it provides services to someone who cannot afford to pay." *Id.* at 1274. Whether an institution renders gratuitously a substantial portion of its services should be based on the totality of the circumstances, as the term "substantial" does not imply a magical percentage. *HUP.*

▮▮ Presently, the trial court considered the YMCA's financial aid awarded from 1993 through 1997 and its volunteer services in concluding that the YMCA donates a substantial portion of its services as required by *HUP.* In addition to its yearly financial aid to members or program participants, the YMCA donated approximately $138,000.00 in free services to the community. (Trial court opinion, p. 9) The trial court further considered the value of the YMCA's volunteer services and concluded that, on average, YMCA volunteers donated time equal to $80,398.00. (*Id.,* p. 10) Financial aid and services to the community and volunteer hours are all relevant to the determination of whether an institution gratuitously renders a substantial portion of its services. *See Mars Area Sch. Dist. v. United Presbyterian Women's Ass'n of N. Am.,* 693 A.2d 1002 (Pa.Cmwlth.1997), *aff'd,* 554 Pa. 324, 721 A.2d 360 (1998)(in determining whether an institution meets this criteria, the factors considered may include, *inter alia,* the remuneration paid to its staff and directors, the institution's budget, the percentage of income used to provide charitable services, the location of the institution, the length of time the institution has been in operation and the cost of providing the charitable services).

Thus, for taxable year 1994, using the averages as found by the trial court, the YMCA donated $354,828.00 of its services to the community ($136,430.00 in financial aid, $138,000.00 in community service projects/programs and $80,398.00 in volunteer hours), or 18% of its revenue.

Section 5(d) of the Act similarly mandates that an entity render gratuitously a substantial portion of its services in order to be considered a "purely public charity."

---

7. Both parties agree that the YMCA's program revenue in 1994 was approximately $1,950,000.00. (See Borough's brief at p. 26; YMCA's brief at p. 5).

10 P.S. § 375(d). Unlike *HUP,* however, Section 5(d)(1) provides seven different means by which an entity may fulfill this criterion. Presently at issue are Sections 5(d)(1)(i) and (v). Section 5(d)(1)(i) provides that an institution may satisfy its burden by providing goods or services to all who seek them, without regard to their ability to pay for what they receive, if all of the following apply:

(A) The institution has a written policy to this effect.

(B) The institution has published this policy in a reasonable manner.

(C) The institution provides uncompensated goods or services at least equal to 75% of the institution's net operating income but not less than 3% of the institution's total operating expenses.

Section 5(d)(1)(i) of the Act, 10 P.S. § 375(d)(1)(i).

The Borough does not dispute that the YMCA has a written policy that is published in a reasonable manner and that therefore, the YMCA has met Section 5(d)(1)(i)(A) and (B). The Borough adamantly denies, however, that the YMCA provides uncompensated goods and services at least equal to 75% of its net operating income but not less than 3% of its total operating expenses.

Specifically, the Borough challenges the method by which the YMCA arrived at its figures to conclude that it renders uncompensated goods and services as required by the statute. The Borough charges that the YMCA unfairly compared *all* of its *operating* expenses to only *some* of its revenue rather than comparing *all* of its *program* operating expenses to its *total program* revenue.

In relevant part, the Act defines "uncompensated goods and services" as follows:

(i) The full cost of all goods and services provided by the institution for which the institution has not received monetary compensation or the difference between the full cost and any lesser fee received for the goods or services, including the costs of goods or services provided to individuals unable to pay.

. . .

(vi) The reasonable value of volunteer assistance donated by individuals who are involved or assist in the provision of goods or services by the institution. The reasonable value of volunteer assistance, computed on an hourly basis, shall not exceed the Statewide average weekly wage as defined in section 105.1 of the act of June 2, 1915, (P.L. 736, No. 338), known as the Workers' compensation Act, divided by 40.

Section 5(d)(4)(i) and (vi) of the Act, 10 P.S. § 375(d)(4)(i) and (vi).

Section 3 of the Act also defines the term "net operating income" as the "amount of funds remaining after all operating expenses related to the provision of goods or services associated with the institution's charitable purpose are deducted from payments received for providing these goods and services, as determined in accordance with the generally accepted accounting principles applicable to the institution." 10 P.S. § 373. "Total operating expenses" is defined as the "costs related to the provision of goods or services associated with the institution's charitable purpose, as determined in accordance with generally accepted accounting principles applicable to the institution." *Id.*

In 1998, the only year at issue to which the Act is applicable, the YMCA donated approximately $206,556.00 in financial aid to its members. (R.R. 1181a) Its services to the community, as averaged by the trial

court, equaled $138,000.00.[8] (Trial court opinion, p. 9) Adding in the estimated value of volunteer services of $114,295.00, the YMCA's total uncompensated goods and services for 1998 equaled $458,851.00. (R.R. 171a)

In that same year, the YMCA's programs generated $2,402,275.00 in revenue and it incurred $2,664,283.00 in operating expenses. (R.R. 169a) The YMCA therefore suffered a loss of $262,008.00 from its operations in 1998 ($2,402,275.00—2,664,283.00 = ( 262,008.00)). Since the YMCA had no net operating income in 1998, it met the requirement of Section 5(d)(1)(i)(C) that it render uncompensated goods and services at least equal to 75% of its net operating income.

Additionally, the YMCA demonstrated that it provides uncompensated goods and services in excess of 3% of its total operating expenses. The YMCA's total operating expenses in 1998 were $2,664,283.00. It offered uncompensated goods and services in the amount of $458,851.00, 17% of its total operating expenses. Clearly, the value of the YMCA's uncompensated goods and services is at least 3% of its total operating expenses.

Moreover, the YMCA illustrated that it met Section 5(d)(1)(vi) of the Act, 10 P.S. § 375(d)(1)(vi), which allows an entity to fulfill the charitable purpose requirement where its uncompensated goods and services are equal to at least 5% of the institution's cost of providing the goods or services. To reiterate, the YMCA donated approximately $455,501.00 in uncompensated goods and services to its members and the community in 1998. The cost of providing such goods and services was $2,664,283.00. Thus, under Section

5(d)(1)(vi), the value of uncompensated goods and services provided by the YMCA in 1998 was 17% of its costs of providing the goods or services.

■ We cannot agree with the Borough's position that the YMCA improperly compared only its program revenue to its total operating expenses. Our review of the definitions provided in the Act shows that net operating income is determined by comparing the amount of funds remaining after *all* operating expenses related to providing goods and services to the *payments received for providing* the goods and services. The Act specifically states that program revenue is to be deducted from the total of all operating expenses related to providing the goods and services. It is not limited to *program* operating expenses.

■ Similarly, we cannot agree with the Borough that time donated by the YMCA's board of directors should not be calculated in determining volunteer hours. Section 5(d)(4)(vi) of the Act does not differentiate between those individuals who actually perform the services (for example, a day camp counselor) and those individuals who determine which goods and services will be provided (the board of directors). Rather, Section 5(d)(4)(vi) provides that the reasonable value of volunteer assistance donated by individuals "who are *involved with* or assist in the provision of goods and services" may be considered. 10 P.S. § 375(d)(4)(vi)(emphasis added). Since the YMCA's board of directors determines the goods and services that the YMCA offers, it is "involved with" the provision of goods and services. Moreover, had the General Assembly wished to exclude volunteer board mem-

---

**8.** In its brief to this Court, the YMCA valued its community services in 1998 as $134,650.00. On page 9 of the trial court's opinion, however, the trial court averaged the value of the YMCA's community services at $138,000.00. Given the fact that the figures are relatively close, we use the values as determined by the trial court.

ber hours from the calculation of uncompensated goods and services, it certainly could have done so. *See Vlasic Farms, Inc. v. Pennsylvania Labor Relations Bd.,* 734 A.2d 487 (Pa.Cmwlth.), *appeal granted,* 561 Pa. 664, 747 A.2d 904 (1999)(it is a canon of statutory construction that a court has no power to insert a word into a statute if the legislature has failed to supply it).

Accordingly, we conclude that the trial court did not err in determining that the YMCA met its burden of demonstrating that it gratuitously renders a substantial portion of its goods and services under both *HUP* and the Act.

*Benefits a Substantial and Indefinite Class of Persons*

■■■ The Borough further maintains that the YMCA fails the *HUP* test because it does not benefit a substantial and indefinite class of persons. The Borough once again relies on its position that the YMCA renders the majority of its services to only the affluent members of the community rather than the community at large.

In order to qualify as a substantial and indefinite class of persons, the beneficiary of the charity must be the public. *Mars Area Sch. Dist.* In the case *sub judice,* the YMCA does not discriminate on the basis of race, sex, national origin, religion or ability to pay. Its membership is not limited in number nor does it refuse membership based on the geographic location of the applicant's residence. The YMCA has an open admissions policy and actively seeks members from all socioeconomic backgrounds. It offers financial aid to those who seek it. *See Lewistown Hosp.* (entity that maintained an open admissions policy without regard to ability to pay for services benefited a substantial and indefinite class of persons who were legitimate objects of charity).

Section 5(e)(2) of the Act defines "legitimate subjects of charity" to mean "those individuals who are unable to provide themselves with what the institution provides for them." 10 P.S. § 375(e)(2). It further defines "substantial and indefinite class of persons" as "persons not predetermined in number, provided that where the goods or services are received primarily by members of the institution, membership cannot be predetermined in number and cannot be arbitrarily denied by a vote of the existing members." *Id.*

The following is a list of goods and services, entities and organizations that the YMCA either offers, offers in conjunction with other community organizations, or allows to use its facilities at no charge: the Latch Key Program; Schools' Out, the DART program, the Child's Center for Creative Learning, the Ambridge Recreation program, the Learn to Swim program, water safety programs, the Black Achievers' program, the Youth Fellowship program, book clubs, food drives, YMCA International, Healthy Kids Day, adult health fairs, youth basketball, summer camp, teen nights, Leaders' Club, teen basketball, adult and senior citizen fitness programs, family night, Indian guides, the Quaker Valley School District, Life Flight, the Salvation Army, U.S. Coast Guard, the Sewickley Police Department, St. James School, Allegheny County Children and Youth Services, Girls Hope Home, Citizen Care, Little Sisters of the Poor, Homecoming Christian Community, Pressley Ridge School, Community Operations, and Neighborhood Center Association. In addition to the reduced or free memberships offered by the YMCA, any number of these services or programs assists those who are legitimate objects of charity. And finally, the YMCA membership is not a predetermined number nor do existing members vote on the applications of proposed members. (R.R. at 46a 103a)

As the Supreme Court noted in *Unionville–Chadds Ford Sch. Dist. v. Chester County Bd. of Assessment Appeals*, 552 Pa. 212, 714 A.2d 397 (1998), the beneficiaries of charity need not be limited to those in financial distress. A purely public charity may be one that provides members of the general public with services that would otherwise not be within their financial reach. *See City of Washington.* Persons who are financially secure may nevertheless be "poor" or "needy" in relation to the outlays needed to obtain certain services in the absence of charity. *Unionville–Chadds.* Thus, the services offered to the community at large are evidence of the YMCA's aid to persons who are legitimate objects of charity.

Accordingly, we conclude that the trial court did not err in determining that the YMCA benefits a substantial and indefinite class of persons who are legitimate objects of charity.

*Relief of a Government Burden*

Under Section 5(f) of the Act, 10 P.S. § 375(f), an entity must relieve the government of some its burden and may satisfy this criterion by demonstrating that it

(1) [p]rovides a service to the public that the government would otherwise be obliged to fund or to provide directly or indirectly or to assure that a similar institution exists to provide the service.

(2) [p]rovides services in furtherance of its charitable purpose which are either the responsibility of the government by law or which historically have been assumed or offered or funded by the government.

10 P.S. §§ 375(f)(1) and (2).

Under *HUP*, an entity must demonstrate that it relieves the government of some of its burden. *HUP.* In *St. Marga-*

*ret Seneca Place*, 536 Pa. at 488, 640 A.2d at 385, the Supreme Court stated that

[t]he *HUP* test of whether an institution has relieved the government of some of its burden does not require a finding that the institution has fully funded the care of some people who would otherwise be fully funded by the government. The test is whether the institution bears a substantial burden that would otherwise fall to the government.

Presently, the YMCA allows local school districts to use its facilities, free of charge, for various school-related activities. To reiterate, several school districts use the YMCA's swimming pools for practice and tournaments and the YMCA's activity fields for lacrosse and soccer practice and tournaments. The YMCA also allows its tennis courts to be used by local schools. The school districts not only use the activity medium but also the YMCA's locker areas and showers. Because the YMCA gratuitously allows the school districts to use its amenities, the school districts are relieved of their burden to provide the necessary facilities for their extra-curricular activities.

Moreover, allowing school districts to use its facilities directly promotes the YMCA's mission statement to build healthy spirit, minds and bodies and to improve the quality of life for children, individuals, and families in the Quaker Valley and neighboring communities. Thus, we conclude that the trial court did not err in determining that the YMCA relieves the government of some of its burden.

*Free from Profit Motive*

The final requirement under *HUP* and the Act mandates that the entity operates free from profit motive. Under Section 5(c) of the Act, an entity may establish that it operates free from profit motive where:

(1) neither the institution's net earnings nor donations which it receives inures to the benefit of private shareholders or other individuals;

(2) the institution applies or reserves all revenue, including contributions, in excess of expenses in furtherance of its charitable purpose or to funding of other institutions;

(3) compensation, including benefits, of any director, officer or employee is not based primarily upon the financial performance of the institution; and

(4) the governing body of the entity has adopted as part of its articles of incorporation a provision that expressly prohibits the use of any surplus funds for private inurement to any person in the event of a sale or dissolution of the entity.

10 P.S. § 375(c).

To support its conclusion that the YMCA does not operate free from profit motive, the Borough contends that we need only look to the Fitness Center and D.T. Watson. These two considerations, however, are not dispositive of the issue of whether the YMCA operates free from profit motive.

The YMCA pays its employees in accordance with the National YMCA guidelines. (Trial court opinion, p. 14; R.R. 229a) There are no bonuses for exemplary performance and the YMCA does not offer its employees fringe benefits. The YMCA does not pay its board of directors or trustees.

Additionally, the YMCA's surpluses have been the result of its endowments and donations and do not inure to the benefit of any individual. (*Id.,* p. 15; R.R. 270a) The YMCA's financial records indicate that for the years at issue, the YMCA's total expenses associated with its operation exceed the membership and program fees received.

 Moreover, the YMCA's surpluses have been rolled over into the continued improvement of the YMCA and its offerings. Under *St. Margaret Seneca Place,* where an entity realizes a surplus of funds and reapplies those funds to the maintenance of its facility, that surplus is not private *profit.*

Testimony established that no individual person receives a benefit from the YMCA's net earnings (Trial court opinion, p. 15; R.R. 270a), that it applies its excess revenue to maintaining its services and facilities (*Id.* p. 15; R.R. 297a–298a), that the YMCA pays its employees according to national standards and therefore, compensation is not based on the YMCA's performance (*Id.,* p. 14; R.R. 299a), and that the YMCA's articles of incorporation ban any individual from profiting from the YMCA's surplus funds (*Id.,* p. 15; R.R. 742a). Thus, there is ample evidence of record demonstrating that the YMCA met its burden under Section 5(c) of the Act.

Accordingly, based upon the evidence presented for review, we conclude that the trial court properly determined that the YMCA sustained its burden of demonstrating that it met the *HUP* standards for the taxable years 1993–1997 and the community service requirements of Section 5(d) the Act for taxable year 1998.

**II. Whether the trial court erred in calculating the taxable square footage of the YMCA's Fitness Center and D.T. Watson.[9]**

In the alternative, the Borough complains that the trial court erred in calculat-

---

9. In its reply brief, the Borough further alleges that the third floor area of the YMCA should not be tax-exempt. Because our review of the record demonstrates that the Bor-

ing the taxable square footage of the Fitness Center and the area leased to D.T. Watson. Specifically, the Borough directs our attention to the trial court opinion wherein the trial court stated

> [i]n addition, the Fitness Center occupies 4000 square feet within the YMCA building, and provides sophisticated cardiovascular and weight training equipment, as well as stairmasters, lifecycles, and computerized treadmills.

(Trial court opinion, p. 3)(emphasis added)

The Borough suggests that the term "in addition" implies that the trial court thought that the Fitness Center amenities were located in only 4,000 square feet of the YMCA's building.[10] The Borough suggests that some Fitness Center amenities are located in the YMCA's new gymnasium and elsewhere in the YMCA building. The Borough would like all areas where Fitness Center amenities are located to be subject to tax. The trial court held, however, that the Fitness Center is actually located in 5,497 square feet of the YMCA's facility.

The Borough fails to recognize that testimony established that those amenities located outside of the 4,000 square feet of the designated Fitness Center are open to all members of the YMCA. (R.R. 259a) There is no segregation of the public's use of the YMCA's general facilities.

The same logic holds true for D.T. Watson. D.T. Watson leases 1,022 square feet of the YMCA. Its clients use the same facilities that are open to the YMCA's general membership.

Therefore, we further conclude that the trial court did not err in calculating the YMCA's taxable square footage as 6,519 square feet.

Accordingly, for the foregoing reasons, we affirm.

## ORDER

AND NOW, this 18th day of April, 2001, the order of the Court of Common Pleas of Allegheny County, dated April 19, 2000, is hereby AFFIRMED.

---

ough failed to raise this issue previously, it is deemed waived. *See* Pa. R.A.P. 302(a) ("[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal.")

10. We disagree with the Borough's contention that language "in addition" implies that the trial court failed to recognized that Fitness Center facilities are located in other areas of the YMCA's building. Our reading of that entire paragraph indicates that the trial court was describing the YMCA's facilities in general and then proceeded to discuss the Fitness Center amenities as part of the YMCA's overall facilities.